Robert SHARP, Robert Bruno, Sheila Bond, Tracey Waddy, Louis Sweet, Vanice Lindsey, Reatha Jones, Karen Sessoms, and Joseph Targia, Plaintiffs,

v.

Catherine M. ABATE, New York City Correction Commissioner, et al., Defendants.

No. 93 Civ. 4357 (LAK).

United States District Court, S.D. New York.

June 20, 1995.

**696**

Pamela H. Schwager, Tellerman, Paticoff & Greenberg, New York City, for plaintiffs.

Georgia Pestana, Asst. Corp. Counsel and Paul A. Crotty, Corp. Counsel of the City of New York, New York City, for defendants.

## OPINION

KAPLAN, District Judge.

The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA"), prohibits employment discrimination against persons with disabilities who are able to perform the essential functions of their jobs, either with or without reasonable accommodation. The New York City Department of Correction (the "Department") has terminated, or seeks to terminate, plaintiffs from their positions as correction officers because each suffers from a physical or emotional condition that allegedly renders each incapable of having contact with prison inmates. Plaintiffs charge that the Department's actions are discriminatory and violate the ADA. Defendants argue that their efforts to terminate plaintiffs are justified because the ADA does not require an employer to continue to employ individuals who cannot perform the essential functions of a job. Defendants argue further that if this were required a great financial hardship would be imposed on the city. The overriding issue presented on defendants' motion for summary judgment thus is whether contact with prisoners is an essential function of the job of a correction officer. There are also issues specific to several of the plaintiffs.[1]

### *Facts*

*Position of Correction Officer*

It is undisputed that the duties of correction officers employed in the New York City Department of Correction include activities requiring contact with prisoners. In fact, the Department's written job description for the position of correction officer states that an officer "maintains security within correctional facilities and is responsible for the custody, control, care, job training and work performance of inmates." (*See* Daly Dec.Ex. C) The "typical tasks" of an officer are described as "maintain[ing] constant watch over and supervis[ing] activities of detainees . . . , [e]nforc[ing] maximum security [and] perform[ing] tours in cell blocks, dormitories or

---

**1.** The claims of Robert Bruno and Louis Sweet were dismissed with prejudice on June 7, 1994 and June 15, 1994 respectively.

other housing units." (*Id.*) Furthermore, a former general counsel for the Department of Correction states that "the essential functions of the position of correction officer require close contact with inmates." (Daly Dec. ¶ 12)

It is clear from the evidence in the record that the Department considers the custody, control and care of inmates an essential function of the job. It is equally clear, however, that the actual duties of many correction officers involve no inmate contact. Non-contact positions exist in many areas of the Department's prisons—for example, in the central control room, in personnel, at the custody desk, entrance security, general office and cashier, among many others. (*See* Dubose Dep. at 39–46, Schwager Aff.Ex. B) Furthermore, positions involving no contact with inmates exist also within the several administrative divisions of the Department.

*Assignments of Correction Officers*

The collective bargaining agreement between the City of New York and the correction officers' union provides that all incapacitated correction officers "shall be entitled to leave with pay for the full period of any incapacity." [2] Correction officers with physical or mental impairments who are not able to work in full duty positions therefore are placed by the Department into one of three so-called Medically Monitored Return ("MMR") categories. Officers in Level I of the MMR categories have "overtime and tour restrictions." Those in MMR II have some physical limitations and cannot supervise inmates alone. Those in MMR III have more serious physical or psychological limitations. (*See* Daly Dec.Ex. D) The assignment of officers to MMR categories is a method by which the Department utilizes incapacitated correction officers who, pursuant to the collective bargaining agreement, are paid full salaries and accrue all benefits during the period of their disability. The Department maintains that placing officers in one of the MMR categories is not intended to be permanent but rather is meant to accommodate incapacitated officers until the officers are able to return to full duty status.

Officers in MMR categories often fill positions requiring no inmate contact. These non-contact positions, however, were not created to accommodate medically monitored correction officers (Dubose Dep. at 69, 46), but rather are "regular" positions that have existed within the Department which are filled by able-bodied correction officers, at least on occasion. (*Id.* at 46–47) In fact, some correction officers are assigned directly to clerical, non-contact positions upon completing their training in the academy. (Israel Dep. at 10–11, Schwager Aff.Ex. E)

*Hardship*

Defendants assert that there is a substantial financial burden on the Department as a result of maintaining officers who cannot supervise inmates in an MMR category. They claim that placing correction officers in MMR status results in the Department's financially inability to fill positions for full duty officers. This, in turn, leads the Department to incur overtime costs averaging approximately $16 million per year. Defendants claim that, in addition to the financial burden, there are morale problems among correction officers when the Department requires them to work overtime—presumably as a result of some budgeted positions being filled with non-contact personnel—in order to fill essential posts within correctional facilities.

*The Proceedings*

The Department discharged plaintiffs Joseph Targia and Karen Sessoms each of whom was a probationary correction officer and had spent more than one year in an MMR category. The Department initiated proceedings under New York Civil Service Law §§ 71–73 to remove from the Department's payroll plaintiffs Sheila Bond, Tracey Waddy, Vanice Lindsey and Reatha Jones, each of whom was a permanent correction officer and had spent more than one year in MMR status.

---

**2.** Article X, Section 2 of the collective bargaining agreement between the City of New York and the union, the Correction Officers Benevolent Association, Inc., provides in relevant part:

"Each Correction Officer shall be entitled to leave with pay for the full period of any incapacity due to illness, injury, or mental or physical defect, whether or not service connected in accordance with existing procedures."

Plaintiffs have brought this action under the ADA, Section 296 of the New York State Executive Law, and the Equal Protection and Due Process clauses of the United States Constitution. Plaintiffs claim that, although they are individuals with disabilities, they are otherwise qualified within the meaning of the ADA to perform the duties of the job of a correction officer. Plaintiffs Sharp, Targia and Sessoms seek reinstatement and back pay as well as damages allegedly sustained by reason of defendants' discrimination. Plaintiffs Waddy, Bond, Lindsey and Jones seek only damages.

Defendants now move for summary judgment dismissing the complaint on the ground that plaintiffs are not qualified individuals with a disability who can perform the essential functions of their jobs. In addition, they seek dismissal as to Sessoms and Lindsey on the theory that neither is an individual with a disability. Finally, the Department argues that plaintiff Targia is collaterally estopped from asserting his claim.

## Discussion

### Essential Function

■ At first blush, there is great appeal to the proposition that guarding prisoners is an essential function—indeed, the *raison d'etre*—of correction officers, or prison guards. But neither the facts of this case nor the law are quite so simple.

Defendants point to the regulations promulgated under the ADA, which provide that a job function may be considered essential because the position exists to perform that function. 29 C.F.R. § 1630.2(n)(2)(i). As the position ·of correction officer exists, defendants argue, to supervise inmates, supervising inmates cannot be considered anything but a function essential to the job. Defendants argue also that the ADA requires the Court to give great weight to the employer's judgment and to the written job description as evidence of what functions are essential.

Plaintiffs, on the other hand, argue that there is a substantial number of correction officer positions designated by the Depart-ment as requiring no inmate contact within the correctional facilities and in the several administrative divisions of the Department. The plaintiffs concede that these positions often are filled by officers in the Department's medically monitored categories. However, in support of their argument that there is a question of fact as to whether the supervision of inmates in an "essential function" of the job, they point to many able-bodied correction officers who also fill or have filled these positions.

Under the ADA and its regulations, a "qualified individual" is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position ... and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). The "essential functions" of a job are the "fundamental job duties of the employment position." *Id.* § 1630.2(n)(1). Evidence of whether a particular function is essential includes, but is not limited to the employer's judgment as to which functions are essential, the written job description, the amount of time spent performing the function, the consequences of not requiring the employee to perform the function, the work experience of past employees in the position, and the current work experience of employees in similar positions. *Id.* § 1630.2(n)(3).

The interpretive guide to Part 1630 of the regulations makes clear that the inquiry into whether a particular function is essential is a fact specific exercise to be made on a case by case basis. 29 C.F.R. Part 1630 App. at 400. All relevant evidence, not merely the factors listed in Section 1630.2(n)(3), should be considered in making ·the determination. In fact, the interpretive guide specifically advises that greater weight need not be given to the types of evidence listed in the regulations. *Id.*

The case law supports the fact specific nature of the inquiry required by the regulations. The Sixth Circuit, in a case under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*,[3] reversed a grant of summary judgment for

---

**3.** Cases interpreting the Rehabilitation Act are instructive in interpreting the ADA. *See, e.g.,* *Staron v. McDonald's Corp.,* 51 F.3d 353 (2d Cir.1995).

defendants on the basis that there was a genuine issue of material fact as to whether a 70–pound lifting requirement was an essential function of a Postal Service distribution clerk, despite the fact that the job description and an affidavit from an employment supervisor stated that it was an essential part of the job. *Hall v. United States Postal Service,* 857 F.2d 1073, 1079–80 (6th Cir. 1988). The Court held that determining "whether physical qualifications are essential functions of a job requires the court to engage in a *highly fact-specific inquiry....* Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Id.* at 1079 (emphasis added). *See also Henchey v. Town of North Greenbush,* 831 F.Supp. 960, 966–67 (N.D.N.Y.1993) (question of material fact exists as to whether heavy lifting is an "essential function" of the job of a "laborer" for the town's Highway Department despite written job description stating that the worker must have the "ability to lift heavy weights").

While defendants' position, as noted, has substantial initial appeal, the fact that able-bodied correction officers are placed in clerical and administrative positions within the Department is troublesome. Indeed, the dispute here may be semantic to some degree. Defendants' argument presupposes that the job at issue is "correction officer," whereas the term and civil service classification "correction officer" may include within it a number of different jobs—just as the term "soldier" includes not only riflemen, but butchers, bakers and, perhaps in former times, candlestick makers.

In resolving this motion, the defendants bear the burden of establishing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). All reasonable inferences must be drawn in favor of the plaintiffs. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). On this record, the Court is constrained to hold that the question whether the supervision of inmates is an essential function of a correction officer rais-

es a genuine issue of fact. Accordingly, this branch of defendants' motion is denied.

*Individual Plaintiffs*

*Lindsey*

■ Defendants move for summary judgment as to plaintiff Vanice Lindsey. It is undisputed that Lindsey no longer is disabled and that she returned to full duty status on November 17, 1993. The Department no longer is seeking to place Lindsey on unpaid leave of absence pursuant to Civil Service Law § 71. (*See* Def. 3(g) Stmt. ¶¶ 95–96) Accordingly, defendants claim she has no case.

Lindsey seeks damages, arguing that the Department's commencement of medical removal proceedings against her was a violation of the ADA. (Pl.Br. at 10–11) Compensatory damages, including emotional damages, as well as punitive damages are available under the ADA. *See, e.g., United States EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1281 (7th Cir.1995). If Lindsey can establish that the attempt to terminate her violated the ADA, the fact that she no longer is disabled would not render her claim for damages moot. Defendants' motion therefore is denied as to Lindsey.

*Sessoms*

Plaintiff Sessoms has suffered from atopic dermatitis since the age of fifteen and alleges that exposure to asbestos and other toxins at the Rikers Island facility exacerbated her condition and triggered allergic reactions. However, she admitted that she successfully held three different jobs over the span of several years as a cashier and as a police aide. (Sessoms Dep. at 59–60, Schwager Aff. Ex. N)

■ The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). An impairment that limits an employee's ability to perform only one job is not a disability under the ADA. *See Huffman v. Ace Electric Co., Inc.,* No. Civ.A. 94–2030–KHV, 1994 WL 583113 (D.Kan. Aug. 29, 1994) (citing *Welsh v. City of Tulsa,* 977 F.2d 1415 (10th Cir. 1992)). In view of Sessoms' employment his-

tory, there is no issue of fact as to whether Sessoms is disabled.

Even if Sessoms were "disabled" within the meaning of the ADA, she did not notify the Department of her condition. (Sessoms Dep. at 53–56, Pestana Dec. Sessoms Ex. 18) The Department therefore had no duty to accommodate her alleged disability. The Department's denial of Sessoms' request to be transferred to another correctional facility therefore was not in any way connected to her physical condition. Accordingly, defendants' motion for summary judgment as to Sessoms is granted on both of these alternative grounds.

### Targia's Article 78 Proceeding

Plaintiff Targia brought a proceeding on July 9, 1993 in the New York State Court pursuant to Article 78 of the New York Civil Practice Law and Rules. Targia there alleged that his termination was arbitrary, capricious and in bad faith (Pestana Dec. Targia Ex. 12 ¶ 22), that it was "solely because of his MMR status" (*id.* ¶ 21), and that it was discriminatory and violative of the ADA (*id.* ¶ 23). The State court dismissed his petition in an opinion issued on July 1, 1994. (Pestana Dec. Targia Ex. 14)

■ The first issue raised by the former adjudication defense is whether the dismissal of Targia's Article 78 petition precludes Targia from bringing the claim that is before me on a theory of claim preclusion. A federal court is required to give the same preclusive effect to a state court judgment as that state's courts would give to it. *See Migra v. Warren City School District,* 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984). However, the principles of claim preclusion govern only those cases in which the initial forum had the power to award the full measure of relief sought in the later litigation. *Antonsen v. Ward,* 943 F.2d 198, 201 (2d Cir.1991). In the Article 78 proceeding, Targia sought reinstatement as a probationary employee of the Department with full back pay, seniority and benefits. (*See* Pestana Dec. Targia Ex. 12 at 1) In this case, in contrast, he seeks damages, which were not, or may not have been, available in the Article 78 proceeding. *Antonsen,* 943 F.2d at 202–04. The doctrine of claim preclusion there-fore does not apply here. Defendants all but concede this point. (Def. Br. at 44–45)

The second question is whether the principles of collateral estoppel, or issue preclusion, bar Targia's claim because an issue essential to his case here has been conclusively resolved against him. *See, e.g., Genova v. Town of Southampton,* 776 F.2d 1560, 1561 (2d Cir.1985) (applying New York law). Defendants argue that Targia is collaterally estopped from relitigating whether defendants' actions were discriminatory and violated the ADA.

■ Collateral estoppel bars a party from relitigating in a second proceeding an issue that was actually litigated and necessarily decided in a prior proceeding, provided that the party had a full and fair opportunity to litigate the issue in the prior proceeding and that the determination of the issue was necessary to support a valid and final judgment on the merits. Furthermore, the issue as to which preclusion is sought must be identical to the issue decided in the prior proceeding. The issues are identical only if the legal standards governing their resolution are the same. *Cullen v. Margiotta,* 811 F.2d 698, 732 (2d Cir.) (applying New York law), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).

■ The State court decision dismissing the Article 78 petition did not necessarily rest on a finding that is inconsistent with a finding that defendants are liable under the ADA. The State court based dismissal of the petition on a finding that the Department did not terminate Targia in bad faith. The court held that the Department's refusal to allow Targia to present his own medical evidence prior to his termination and its reliance solely upon the opinion of the medical examiner appointed by the Department did not indicate bad faith. (Pestana Dec. Targia Ex. 14 at 4–5) This finding is not necessarily inconsistent with a finding of liability under the ADA. Therefore, Targia is not collaterally estopped from litigating defendants' liability in this case. *Cf. State of New York v. King,* 36 N.Y.2d 59, 364 N.Y.S.2d 879, 324 N.E.2d 351 (1975).

*Conclusion*

Defendants' motion for summary judgment dismissing the complaint is granted as to plaintiff Karen Sessoms and otherwise denied.

SO ORDERED.