Danny J. WHITE, Plaintiff,

v.

### BOEHRINGER MANNHEIM CORPORATION, Defendant.

No. IP 96–0232–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 15, 1998.

528

Donald F. Foley, Foley & Pool, Indianapolis, IN, for Plaintiff.

Steve A. Oldham, Indianapolis, IN, Kenneth J. Yerkes, Barnes & Thornburg, Indianapolis, IN, for Defendant.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Danny J. White ("White"), alleges that his former employer, Defendant Boehringer Mannheim Corporation ("BMC"), discriminated against him in violation of the

Americans with Disabilities Act ("ADA") by failing to accommodate his alleged disabilities, which include hyperlipidemia (high cholesterol), contact dermatitis (allergic skin rash), and lumbosacral strain (back strain). Defendant responds that Plaintiff does not suffer from a disability recognized by the ADA, and assuming Plaintiff demonstrates otherwise, BMC ultimately terminated his employment for a legitimate, non-discriminatory reason. Defendant moves for summary judgment. For the reasons discussed below, Defendant's motion must be *GRANTED*.

## I.  Statement of Facts

BMC manufactures and distributes medical diagnostic products for use in the health care field. It employs more that 2,000 employees in various technical, administrative and managerial positions. Grow Aff. ¶ 3. BMC hired Plaintiff in 1987 as a tool & die maker. White progressed fairly well at the company over the next eight years until his termination on January 3, 1995. He became a Safety Administrator in 1989, with responsibility for coordination of safety meetings, administration of safety programs, accident investigation, development of safety enhancement measures, and emergency response. White Depo. at 89–99. His job title changed in 1990 to Safety Specialist, but his duties increased only slightly to include serving as liaison to municipal agencies, such as the fire department, and working to decrease BMC's property and casualty insurance premiums. *Id.* at 100–104.

White's supervisor in the Safety Department, Jeff Regnier, created the position of Senior Safety Specialist in October, 1992 and promoted Plaintiff to fill the post. Regnier Aff. ¶ 5. White served in this capacity until his 1995 termination. His job description included: safety program development (30%), safety training development and presentation of training (30%), safety policy development (10%), accident investigation and statistical analysis (10%), coordination of safety management issues (10%), coordination of the emergency response team (5%), and other duties as assigned (5%). Defendant's Ex. 2(A). White agrees with this description of these responsibilities, aside from the statistical analysis duties, which a co-worker mainly performed. White Depo. at 112–18.

In the main, the position of Senior Safety Specialist does not require heavy lifting. Regnier Aff. ¶ 5; Regnier Dep. at 156, 161. The job description lists the purpose of the job "to be more management oriented," requiring the employee to "be involved heavily in program, policy and training development." Defendant's Ex. 2(A). White also believes that he "didn't have to do a lot of heavy lifting on most occasions." White Depo. at 245.

Occasionally, however, White participated on the Emergency Response Team ("ERT"), one of his "other duties" that account for 5% of his time. The 30–member ERT responds to on-site emergencies and accidents, such as chemical spills and employee injuries. Regnier Aff. ¶ 6. A variety of positions comprise the ERT, including an Incident Commander, who assigns tasks and decides strategy, a Logistics Officer, who orders equipment and obtains reference information, a Safety Officer, who monitors the response and ensures safety protocol, and an Entry Team, which physically enters the contaminated area and controls the hazard. White Depo. at 172–80. Only Entry Team members wear protective equipment. Regnier Aff. ¶ 8. ERT members apparently determine their respective roles on a case-by-case basis, and no ERT member is required to perform on the Entry Team. Regnier Aff. ¶ 8–9.

Members of the Entry Team, at times, wear protective equipment, depending on the nature of the incident. Regnier Aff. ¶ 9. Such equipment could consist of a thirty-five pound self-contained breathing apparatus ("SCBA") and other rubber, plastic or silicone-based products, such as a mask, gloves or glasses. White Depo. at 197–203. Some incidents, such as a propanol spill, may not require use of masks or respiratory tanks, while other accidents, such as fire alarm responses, may not require adornment of any protective equipment at all. *Id.* at 226–28.

Plaintiff participated on the ERT, which occasionally involved his joining the Entry Team and wearing some combination of safety gear. White contends that the plastic and

rubber-based products, primarily the face mask, caused contact dermatitis, an allergic skin rash on his face and upper extremities. White Depo. at 191–92, 197–202. He also contends that the heavy gear sometimes worn by Entry Team members risked injury to his back. White Depo. at 214. He states that BMC, namely Regnier, refused the one main request that could accommodate his contact dermatitis and back injury—removal from the Entry Team detail on the ERT. White Depo. at 214–15.

White experienced the onset of his first alleged disability in May 1991 by injuring his back. White Dep. at 204–06. His physician reports included an expected absence from work for one day and described White's diagnosis as a "Lumbosacral and right Iliopsoas strain rule [sic] out intervertebral disc disease." Defendant's Exs. 3(A–B). White returned to work within one week under a fifteen-pound lifting restriction, which improved to a thirty-five pound restriction less than two weeks later on June 10, 1991. Defendant's Ex. 3(C). On July 16, 1991, less than two months after White's initial back strain, he received medical clearance to resume regular work without restriction. Defendant's Ex. 3(D). The physician treatment report reveals that the back injury was not a permanent impairment. *Id.*

White does not recall other back problems until sometime in 1993, but like his 1991 back injury, he does not "recall any of the specifics" of this injury. White Depo. at 208. His March 22, 1993 physician report indicates that White suffered "lumbosacral strain" by slipping on stairs and twisting his back. Defendant's Ex. 3(E). Dr. Smith cleared White to work with a "very light work" restriction (*Id.*), which improved on April 5, 1993 to "No lifts over 40 lbs. No frequent bends for 1 week." Defendant's Ex. 3(F).

White's next health episode struck in September, 1993 when he missed a few days of work. A brief note from the Stirling Clinic, dated September 14, 1993, indicates White's condition as "unable to work due to hyperli-

pidemia and dermatitis." Defendant's Ex. 3(G). A second note from a different physician, Dr. Kleman, dated fives days later, September 19, 1993, authorizes that "Mr. White may return to work." Defendant's Ex. 3(H). Neither note lists work restrictions, nor do they describe the causes of the conditions. White offers no physician affidavits or personal testimony that he received medical restrictions due to either of these two conditions.

White sought treatment for the hyperlipidemia on this one occasion because he "started to get dizzy" at work. White Depo. at 192–196. On September 20, 1994, White returned to BMC and presented the two notes to Kathryn Ritter, Occupational Health and Wellness Manager for BMC. White Aff. ¶ 5. Ritter is not a physician and cannot issue permanent medical restrictions, but she shouldered responsibility for managing employee health issues, reviewing physician-imposed medical restrictions, and issuing short-term interim restrictions to ease BMC employees back into the workforce after an absence. Ritter Aff. ¶ 3.

Based upon the two notes, Ritter imposed an interim five-pound lifting restriction on White as "an act of caution" to ease White back into his job. Ritter Aff. ¶ 11; Defendant's Ex. 3(I). White did not request the restriction (White Aff. ¶ 8), and she ordered it at her own discretion. Ritter Aff. ¶ 11. The parties dispute whether Ritter informed White that the restriction would expire in one week absent a further written restriction from his physician.[1] (White Aff. ¶ 7). Ritter testifies that based on custom and practice, her interim restrictions are not intended either to replace physicians' restrictions or to extend beyond one week. Ritter Aff. ¶ 6. Neither party alleges that a back injury caused White's temporary work absence in September, 1993. White Aff. ¶ 5; Ritter Aff. ¶ 11; Defendant's Exs. 3(G–H).

White's next back-related complication occurred on November 7, 1994, over a year and a half after White's last back injury in

---

1. We will assume that White never realized the temporary nature of Ritter's restriction. However, White offers no affidavits, other evidence, or citations to the record indicating that his physician actually imposed medical restrictions on this occasion, and we cannot locate any evidence in his personal testimony to this effect.

March, 1993. White received a fifteen-pound lifting/no excessive forward bending at the waist restriction from Dr. Kleman. Defendant's Ex. 3(J); White Depo. at 240–46. White requested that his doctor remove the restriction around November 19, 1994. He received the medical clearance and returned to normal work activities without restriction. White Depo. at 243. White does not provide an affidavit from Dr. Kleman or otherwise identify the cause of his injury. The record indicates, and Plaintiff does not suggest otherwise, that Regnier and Ritter did not receive notice of this restriction until at least a month later on December 7, 1994. White Depo, at 264; White Aff ¶ 13; Regnier Depo. at 87.

Surprisingly, Plaintiff also never specifies the number of times he participated on the ERT or the smaller Entry Team subgroup. An exhaustive review of the record provides no enlightenment on how often White wore the thirty-five pound SCBA and corresponding plastic and rubber-based equipment. White identifies one incident on June 14, 1994 involving a mock emergency response drill where he wore full protective equipment after his supervisor, Regnier, ordered him to perform a rescue operation. White Depo. at 365–67. No evidence indicates that White labored under any lifting restrictions at the time, as White's last lifting restriction was a 40–pound limitation imposed over a year earlier in April, 1993. Defendant's Ex. 3(F). White does state that he suffered contact dermatitis as a result of his involvement on the Entry Team on June 14. White Depo. at 369.

While viewing the record in a light most favorable to White establishes that he wore safety equipment while performing some Entry Team functions, the evidence also proves that he assumed non-Entry Team duties while on the ERT. As a senior member of the 30–person ERT squad, second in rank only to Regnier, White generally served as the Incident Commander directing and coordinating the ERT, a position not aggravating to his alleged disabilities. Regnier Aff. ¶ 7; White Depo. at 176–80, 253–54.

In addition to his back injuries, White reported episodes of contact dermatitis to BMC's Department of Occupational Health and Wellness on at least two occasions, first on September 19, 1991, and second almost a year later on September 24, 1992. The first entry in BMC's injuries and illnesses OSHA logs describes the condition as "dermatitis/face" (Plaintiff's Ex. 1(A)), in reaction to an air-purifying respirator. White Depo. at 196–98. The second log entry characterizes the condition as an "allergic reaction" (Plaintiff's Ex. 1(A)), to a pair of visitor-type plastic safety glasses. White Depo. at 199–201. The incident reports note that White did not miss any work days due to these incidents. Plaintiff's Ex. 1(A).

BMC responded to the 1991 report by providing White with a more advanced respirator that he preferred, although the new model contained the irritant silicone. White Depo. at 198, 290; Regnier Depo. at 37. In reaction to the 1992 incident, BMC provided White with special, stainless steel glasses that alleviated most of his contact dermatitis. White Depo. at 201.

White further contends that he suffered contact dermatitis roughly once every two months from the 1992 incident until his termination, although he offers no medical restrictions or witness affidavits documenting these incidents. White Depo. at 371. He accounts for the absence of additional records by claiming that Regnier ordered the safety department in 1992 not to document White's further contact dermatitis in BMC's business logs. Id. at 288–89, 370. Regnier agrees that he witnessed White's contact dermatitis "a number of times" during White's employment at BMC (Regnier Depo. at 153–54), but he denies instructing any individuals not to chronicle incidents that White reported. Regnier Depo. at 36. Despite this dispute, at the summary judgment stage we will assume that White experienced skin rash about once every two months after 1992.

The preceding circumstances provide the backdrop for the main event precipitating White's termination. On December 6, 1994, White sought Regnier's professional advice and opinion about his future and current role at the company. White Dep. at 246, 255, 264; Regnier Dep. at 93. By both parties' accounts, the discussion did not go well. A

company had approached White with a job offer and he solicited Regnier's perspective on the matter. White Depo. at 256. Regnier believed that while White was a valuable member of the safety department (Regnier Dep. at 97), he did not possess the personal interaction skills to manage at a position higher than the one to which he already had been promoted. Regnier Depo. at 93–94. White's performance appraisals verify his capable, and sometimes exceptional, technical performance, but they also consistently record the personality clashes and disruptive conflicts caused by his strong personality and abrasive interpersonal relations. Plaintiff's Exs. 4(A–I). Regnier therefore advised that White should consider taking the job if White expected to advance beyond his current level in the safety field. White Depo. at 264; Regnier Depo. at 94.

Within the next day, White telephoned Dr. Kleman and requested that he reinstate the fifteen-pound lifting restriction imposed a month earlier on November 7 (removed on November 19). White Depo. at 245–49. Dr. Kleman apparently responded to the request without physically examining White since on December 6 his office promptly faxed a copy of the restriction to the safety department at BMC and mailed a copy directly to White. White Depo. at 241–46; Plaintiff's Ex. 1(C).

Unfortunately, the restriction was dated November 7, 1994, one month earlier. Plaintiff asserts that Dr. Kleman's nurse inadvertently wrote the November 7 date on the December 6 restriction because that was the last time White had visited the doctor's office. White Depo. at 242. Plaintiff placed the restriction on Regnier's office chair on December 7 and briefly discussed the issue with Regnier that day. White Depo. at 278–79. White then "asked [Regnier] for a reasonable accommodation" given White's expectation that his physician "was going to place me" on a lifting restriction "for quite some time."[2] White Depo. at 274, 278. From December 8 through December 27, White took a leave of absence from BMC due

2. In a herculean effort to construe the record in favor of White, this court finds that despite the lack of affidavits or other objective evidence, a jury could find that White received a genuine restriction on December 6–7. However, no admissible evidence allows us to conclude that the restriction was permanent. White contends that in addition to his statement to Regnier, he told another BMC employee (via voice mail) immediately prior to taking his December 8 leave of absence that his doctor "was going to" place a permanent restriction on his lifting. White Depo. at 277–78. Both statements are inadmissible hearsay since their basis rests upon what White's physician told him. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir.1996) (finding that deposition testimony detailing physician's statements to patient were hearsay). White could have cured this problem quite simply by offering his physician's affidavit or providing other admissible evidence that he labored under a permanent restriction in December.

Likewise, White claims that nurse Kathy Hawkins called his physician's office on December 13, 1994 and confirmed the December 7 restriction date. White Depo. at 250. White's testimony about both the content of nurse Hawkins' alleged conversation and her impressions of it constitutes inadmissible hearsay and must be disregarded pursuant to BMC's motion to strike. Again, Plaintiff does not offer nurse Hawkins' affidavit or deposition testimony.

Finally, on December 13, Kathy Ritter provisionally wrote the word "permanent" across one of the versions of the December 6–7 restriction (dated November 7). Ritter Aff. ¶ 12; Defendant's Ex. 3(J). BMC had received this version of the restriction when White visited its offices on December 13 during his leave of absence. Ritter Aff. ¶ 12; White Aff. ¶ 13. Defendant's Ex. 3(J). Although White believes he gave a copy of his restriction to Hawkins, not Ritter, when he visited BMC, he does not deny that Ritter wrote this notation after he told her his restriction was permanent. Ritter Aff. ¶ 12; White Aff. ¶ 13. He also does not deny that she wrote the notation conditionally, subject to his submission of documentation from his physician that the restriction was permanent. *Id.* Ritter had not spoken with White's doctor and, therefore, based her permanent notation solely on the information White's doctor allegedly told him, not on objective medical or other admissible evidence. Ritter Aff. ¶ 12. White never has provided BMC or this court with any medical or other evidence that he suffered a permanent disability in December. We are not required to bend over backwards for the Plaintiff by crediting conclusory statements and inadmissible hearsay—especially when, assuming White did suffer a permanent restriction, he very easily could have submitted admissible evidence through his physician's affidavit or deposition. *See, e.g., Patterson v. Chicago Assoc. for Retarded Citizens*, 150 F.3d 719 (7th Cir.1998) (finding that ADA plaintiff's speculation and self-serving affidavits without factual support in the record will not defeat a motion for summary judgment).

to family problems, depression, anxiety and fatigue. White Depo. at 268–73.

Upon reviewing the out-dated restriction and noting that White did not present it until shortly after their talk about his limited future advancement at the company, Regnier concluded that White concealed his restriction for one month and intentionally mislead him about when his physician imposed the limitation. Regnier Depo. at 87–88, 93–94. He also believed, apparently erroneously, that White disregarded doctor's orders by performing functions on the Entry Team that exceeded his lifting restrictions.[3] Regnier Depo. at 165–72.

Regnier consulted Marsha Hammond, BMC's Human Resources Manager, and determined that Plaintiff's actions constituted dishonest behavior, insubordination, failure to observe rules, and failure to follow safe practices, all terminable offenses under BMC's Rules of General Conduct. Regnier Aff. ¶ 11. On December 12, Regnier recommended to Human Resources, the Legal Department and the President that BMC terminate White's employment. Regnier Depo. at 199.

White returned to BMC on December 27 and sent Regnier an e-mail requesting accommodation for his back and dermatitis. Pl. Br. at 2–3. Regnier, on vacation when White sent the message, terminated White when he returned on January 3, 1995 and never responded to the accommodation request. Regnier Aff. ¶¶ 13–16.

## II. Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 748 (7th Cir.1998). Yet, neither the mere existence of some alleged factual dispute between the parties, Baulos v. Roadway Express, Inc., 139 F.3d 1147, 1152 (7th Cir.1998), nor the existence of "some metaphysical doubt as to the material facts," Fairchild v. Forma Scientific, Inc., 147 F.3d 567, 571 (7th Cir.1998) (internal quotations omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), is sufficient to defeat a motion for summary judgment.

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. Celotex, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. See Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir.1992); Wolf v.

---

**3.** Regnier incorrectly believed that White was under restriction when he participated in an emergency response event on November 31 that required him to lift and bend. Regnier Dep. at 87–88, 165. Plaintiff notes in his brief that he was not under restriction on that date, as his physician had removed the November 7 restriction on November 19. Pl. Br. at 21–22. He also states that his participation on the ERT Entry Team on December 1 and 2 did not involve wearing the types of equipment that would involve injuring his back or irritating his skin. Id. While Plaintiff attempts to cite this evidence to establish pretextual termination of his employment, it undermines the claim that he experienced substantial limitations in the major life activity of working.

*City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir.1994). "[E]mployment discrimination cases are not governed by a separate set of rules ... they remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts." *Patterson v. Chicago Assoc. for Retarded Citizens,* 150 F.3d 719, 723 (7th Cir.1998) (internal quotations omitted) (*quoting Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir.1997)). Thus, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir. 1989).

### B. Americans With Disabilities Act

White asserts a failure to accommodate claim against BMC, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* He also seemed originally to assert a disparate treatment claim based on BMC's termination of his employment. *See* Complaint ¶ 16. However, White retreats to the failure to accommodate claim in his brief, apparently sacrificing his opportunity to prove disability discrimination indirectly by utilizing the *McDonnell Douglas* test.[4] *See Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1010 (7th Cir.1997) (recognizing that the *McDonnell Douglas* test is "designed to make it easier ... for a victim of discrimination to prove a case."). The parties disagree whether this case is of the disparate treatment or reasonable accommodation ilk. The debate is academic. Success on both types of ADA claims requires the Plaintiff to prove that he suffers a disability, a burden White has failed to carry. *See Ross v. Indiana State Teacher's Assoc. Insur. Trust,* 159 F.3d 1001, 1012 (7th Cir.1998) (finding that an ADA plaintiff bears the burden of establishing that he is a qualified individual with a disability).

Under the ADA, an individual is disabled if he (1) has a physical or mental impairment which substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2); *DePaoli v. Abbott Labs.,* 140 F.3d 668, 671 (7th Cir.1998). The Act itself sheds little light on the meaning of these terms, so courts routinely rely upon Equal Employment Opportunity Commission ("EEOC") regulations implementing Title I of the ADA. *See* 29 C.F.R. § 1630 *et seq.; Baulos v. Roadway Express, Inc.,* 139 F.3d 1147, 1151 (7th Cir.1998) (utilizing EEOC regulations to define "disability" under the ADA and finding summary judgment proper

---

4. The methods of proof for disparate treatment and failure to accommodate claims differ. To establish a prima facie case of disability discrimination under the *McDonnell Douglas Corp. v. Green* test, Plaintiff must demonstrate: (1) he is disabled within the meaning of the ADA; (2) his work performance satisfied his employer's legitimate expectation; (3) he was discharged; and (4) the circumstances surrounding his termination make it more likely than not that his disability was the reason for his firing. *See Leffel v. Valley Fin. Servs.,* 113 F.3d 787, 794 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997). If Plaintiff can establish a prima facie case, the burden shifts to Defendant to advance a legitimate, non-discriminatory reason for its action. Plaintiff must counter with evidence to establish that Defendant's reason is merely a pretext for discrimination.

The *McDonnell Douglas* test is "unnecessary and inappropriate" in reasonable accommodation claims under the ADA. *Hunter v. Habegger Corp.,* No. 97–2133, 1998 WL 104635, at *n. 5 (7th Cir. Mar.5, 1998) (internal quotations omitted) (*quoting Bultemeyer v. Fort Wayne Community Schs.,* 100 F.3d 1281, 1284 (7th Cir.1996)). Instead, Plaintiff must demonstrate that he suffered a disability within the meaning of the ADA, that Defendant knew of his disability, and that he was an "otherwise qualified individual" who could satisfy the essential requirements of his job with or without reasonable accommodation. Plaintiff also must demonstrate that Defendant failed to take reasonable steps to accommodate her disability. *See Bultemeyer,* 100 F.3d at 1284–85.

where truck drivers failed to prove that their sleep impairments were disabilities).

The regulations, in turn, define "physical or mental impairment" as:

(1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) [a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

■ "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test." *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 506 (7th Cir.1998) (affirming summary judgment on ground that Attention Deficit Disorder did not substantially limit plaintiff's ability to work and therefore did not qualify as a disability under the ADA).

Oddly, Plaintiff never identifies a category of major life activities he cannot perform. Consequently, Defendant filed its summary judgment motion assuming Plaintiff at some point would allege substantial limitations in the major life activity of working. Plaintiff never responded in his Reply brief or took issue with Defendant's supposition. In fact, Plaintiff never addressed the issue of substantial limitations on life activities at any point in his pleadings. Thus, we will consider whether Plaintiff was substantially limited in working, the only major life activity raised by either party.

■ Substantially limited in the major life activity of working means:

[S]ignificantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having compa-

rable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). In determining whether an impairment is substantially limiting, a court generally should consider: (1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment. *See id.* at 1630.2(j); *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995).

■ In regard to the major life activity of working, other factors a court may consider in assessing substantial limitations include: (1) the geographic area to which the person has reasonable access, (2) both the job from which the individual has been disqualified, and the number and types of other jobs using similar training, knowledge, skills, and ability, from which the person is also disqualified, and (3) other jobs in the area that do not require the same training, knowledge, skills, and ability, from which the individual is also disqualified. *See* 29 C.F.R. § 1630.2(j)(3)(ii). "It is now well-established that an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Baulos,* 139 F.3d at 1151 (internal quotations omitted) (*quoting Homeyer v. Stanley Tulchin Assocs., Inc.,* 91 F.3d 959, 961 (7th Cir.1996)).

Hence, guided by the above considerations, our determination of whether Plaintiff suffers from a disability depends on whether his lumbosacral strain, contact dermatitis, and hyperlipidemia substantially limit his ability to perform either a class of jobs or a broad range of jobs in various classes.

■ This inquiry into whether a plaintiff is disabled under the ADA is an individualized one, to be assessed on a case-by-case basis. *See Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995). The question of whether a particular plaintiff is disabled under the ADA is an issue regularly considered by courts on motions for summary judgment.

*See, e.g., Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524–25 (7th Cir.1996) (affirming summary judgment on ground that plaintiff was not disabled because her supervisor caused her stress). Accordingly, we move to consider if Plaintiff suffered disabilities within the meaning of the ADA.

#### 1. The Back Injuries

Plaintiff's argument that his back injuries constitute a disability sinks before it sets sail. White *never even alleges* (never mind adduces proof) that his temporary back injuries substantially limit any major life activity, much less his ability to work generally or to perform his specific job at BMC. "Failure to produce evidence alone may be deemed grounds for summary judgement." *Schroeder v. University of Illinois.,* No. 96 C 6020, 1997 WL 587699, at *12 (N.D.Ill. Sept.18, 1997). The record, construed in a light most favorable to White, demonstrates that White could perform his job as Senior Safety Specialist quite capably at the time of his termination.

Plaintiff actually asserts in his brief that "White was able to perform the essential functions of his job without accommodation" at the time of his termination. Pl.Br. at 19. His performance evaluations, completed in the midst of intermittent, medical back restrictions (May–July 1991, March–April 1993, November 1994, and December 1994) note his technical proficiency and award him with yearly pay increases. Plaintiff's Exs. 4(A–I).

The undisputed evidence shows that over 95% of White's job responsibilities constituted management-oriented tasks not involving heavy lifting, such as developing safety programs and policy. Defendant's Ex. 2(A). Both White and his supervisor, Regnier, agree that the job did not involve significant lifting on most occasions. White Depo. at 245; Regnier Aff. ¶ 5; Regnier Depo. at 156, 161. White never identifies how much of the 5% of his ERT duties involved participation on the ERT Entry Team, the one and only job responsibility that the parties allege could injure his back. White Depo. at 214–16. While he surely participated on the Entry Team on some occasions, White never bothers to show (1) if he was under restriction during any episode, (2) if any incident was the type requiring heavy gear, and (3) if the gear required violated any of his temporary medical restrictions. The evidence indicates that his senior position in the safety department resulted in his assumption of ERT Incident Commander duty, which did not involve activity threatening to his back. Regnier Aff. ¶ 7; White Depo. at 176–80, 253–54.

Plaintiff has not met his burden of demonstrating a substantial limitation in his ability to perform the particular job of Senior Safety Specialist, and he never has attempted to show how his back injuries limited his employment generally in a broad range of jobs in various classes. *See Stevo v. CSX Trans. Inc.,* No 95 C 7449, 1997 WL 667816, at *1, 6 (N.D.Ill. October 24, 1997) ("A plaintiff has the burden of producing evidence showing a significant restriction in his ability to perform a class of jobs or a broad range of jobs in various classes."), *aff'd,* No. 97–3974, 1998 WL 516788 (July 27, 1998).

In *Stevo,* the court held that the plaintiff's permanent forty-pound lifting restriction did not constitute a substantial limitation on working even though plaintiff suffered "degenerative lumbar spine disease with early stenosis at the L4–5 level." *Id.* In contrast to the plaintiff in *Stevo,* no evidence in the record indicates that White suffers from a permanent back impairment. *See* n. 2, *supra.* Rather, his longest restriction, the 1991 injury, lasted less than two months, and the physician's report reveals the injury was not permanent. Defendant's Ex. 3(D). Indeed, White continued working at BMC for four more years, during which time he received a promotion and annual pay raises. *See also Howard v. Navistar Int'l Transp. Corp.,* No. 95–3941, 1997 WL 53044, at *2 (7th Cir. Feb.5, 1997) (finding that plaintiff failed to carry burden of demonstrating a substantial limitation in the major life activity of working, partially because plaintiff continued to work at the business after his return from elbow surgeries). White also never has received a permanent partial impairment rating on his back. White Depo. at 252. He offers no legal authority to support his claim

that his back restrictions qualify as ADA disabilities.

White's four temporary, doctor-ordered back restrictions over his eight year BMC employ reveal the exact type of "intermittent, episodic" impairment beyond the coverage of the ADA. *Vande Zande v. State of Wisconsin Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir.1995). "[T]he great weight of authority holds that lifting restrictions, such as the twenty-five pound lifting restriction imposed on [plaintiff], do not significantly restrict the ability to work." *De Marco v. Pals Express, Inc.*, No 96 C 6817, 1997 WL 619829, at *7 (N.D.Ill. Sept.30, 1997); *See Schroeder*, 1997 WL 587699 (finding herniated disc injury not a disability since it lacked the requisite permanence under the ADA); *Duffin v. Federal Express Corp.*, No 95 C 3723, 1997 WL 208428, at *3 (N.D.Ill. Apr.22, 1997) (holding that courier's twenty-five pound lifting restriction did not qualify for ADA protection); *Matthews v. TCI of Illinois*, No 95 C 4096, 1996 WL 332693, at *4–5 (N.D.Ill. June 14, 1996) (stating that plaintiff's forty-pound lifting restriction did not constitute a disability since plaintiff "presented no evidence that his injuries have made him less competitive in the general marketplace or significantly affected his employment opportunities"); *Czopek v. General Elec. Co.*, No. 93 C 7664, 1995 WL 374036, at *2–3 (N.D.Ill. June 21, 1995) (finding that plaintiff's twenty-pound lifting restriction did not qualify as an ADA disability; plaintiff presented "no evidence showing the number and types of jobs from which he is disqualified nor the geographical area to which he has access").

Furthermore, White is employed and has obtained two full-time jobs since his termination from BMC, the first one at Manufacturing Technology and the second at Hamblen Gage where he even works some overtime as a project manager. White Depo. at 218; 340–42, 347. White also received an employment offer while still at BMC, which prompted him to solicit Regnier's advice about his future advancement at the company. He received yet another employment offer in January, 1995 from a

South Bend, IN company, which he declined. White Depo. at 337–38.

Also, beginning in April 1994 while still at BMC, White received training and worked seasonally as a firefighter at the Indianapolis Motor Speedway. Plaintiff's Ex. 2. His job description lists the following responsibilities: assist driver with apparatus and equipment inspection and maintenance, provide fire protection and scene security, assist in track clean up, and observe the track for debris or unsafe conditions. Plaintiff's Ex. 2(A). The parties dispute whether White operates 80-pound "jaws of life," but suffice it to say that a duck is a duck. *Compare* Plaintiff's Exs. 3–4 *with* Defendant's Ex. 4. White is a seasonal firefighter, he submitted the above job responsibilities into evidence, and he admits that he extinguishes fires in emergency situations, lifts a twelve to fifteen-pound fire extinguisher, and sweeps the race track. White Depo. at 343–47.

The Seventh Circuit has held that " '[a] court may also examine whether a plaintiff can perform or has procured other employment.' The ability of plaintiffs to find alternate work has been a major factor in granting summary judgment to employers." *Garza v. Abbott Labs.*, 940 F.Supp. 1227, 1238 (N.D.Ill.1996) (internal citations omitted) (*quoting Byrne v. Board of Educ.*, 979 F.2d 560, 565 (7th Cir.1992)). In light of White's ability to obtain other employment, his capable performance as Senior Safety Specialist, and his complete failure to argue substantial limitations in his work ability while at BMC or thereafter, no reasonable jury could find that White's back restrictions substantially limited his ability to perform either a class of jobs or a broad range of jobs in various classes.

### 2. Contact Dermatitis

█ For many of the same reasons just discussed, White has not carried his burden of proving that his skin rash substantially limited his ability to perform either his specific job as Senior Safety Specialist or a broad range of jobs. His participation on the ERT Entry Team composed a small portion of his overall responsibilities at BMC. Defendant's Ex. 2(A); White Depo. at 112–18. The

steel glasses he began wearing alleviated most of the dermatitis caused by plastic eyewear. White Depo. at 198, 200. While face masks and respirators have aggravated his skin since 1991, he provides no evidence that these dermatitis flares prevented him from ably completing his job duties. On the contrary, he touts his job performance with alacrity in his pleadings. Pl.Br. at 6, 18.

The Seventh Circuit has held that "[a]n inability to perform one particular job, a portion of one particular job for a single employer, or increased discomfort while performing a major life activity does not constitute a substantial limitation on the ability to perform such activities." *Benedict v. Eau Claire Pub. Schs.*, No. 97–2513, 1998 WL 60374, at *6–7 (7th Cir. Feb. 10, 1998) (finding that teacher who had difficulty walking between classes due to a "constellation" of maladies, such as chronic back, shoulder, muscle and ligament pain, failed to establish a substantial limitation in the performance of any major life activity). White's allergic skin condition may be an uncomfortable impairment, but the record clearly demonstrates that it has not substantially limited White from working. He missed work because of "hyperlipidemia/dermatitis" for only one brief period during his eight years at BMC. Defendant's Ex. 3(H). His condition has not prevented him from receiving employment offers, accepting them and working full-time. In short, he presents no evidence or legal authority that skin rash caused by certain types of facial equipment substantially limits him from performing the duties of Safety Specialist or any other position. *See De Marco,* 1997 WL 619829 (failing to produce evidence may be deemed grounds for summary judgment); *Friedel v. City of Madison,* 832 F.2d 965 (7th Cir.1987) (noting reticence of court to wade through the record and make arguments for either party).

The ADA is not "a general protection of medically afflicted persons," and without more evidence from Plaintiff demonstrating that his dermatitis limited his ability to work generally, no reasonable jury could find in his favor. *Christian v. Saint Anthony Med. Ctr., Inc.,* 117 F.3d 1051, 1053 (7th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1304,

140 L.Ed.2d 469 (1998); *see also Boren v. Wolverine Tube, Inc.,* 966 F.Supp. 457, 463 (N.D.Miss.1997) (holding that employee's chemical allergy preventing her from such activities as painting and food preparation did not constitute exclusion from a class of jobs or broad range of jobs in various classes); *Shah v. Upjohn, Co.,* 922 F.Supp. 15, 25 (W.D.Mich.1995) (finding that even if chemist's allergens prevented her from working in all laboratories, such a limitation did not substantially limit her employment as a whole and render her disabled for ADA purposes), *aff'd,* 107 F.3d 871 (1997); *Sharp v. Abate,* 887 F.Supp. 695, 699–700 (S.D.N.Y. 1995) (finding that plaintiff who suffered from atopic dermatitis exacerbated by her employment at a particular prison was not disabled under the ADA; she had held "three different jobs over the span of several years" and therefore disqualification from one job did not engage ADA protection).

### 3. Hyperlipidemia ("high cholesterol")

■ White's three sentence attempt to qualify hyperlipidemia as an ADA disability seems like a hummed afterthought. Pl.Br. at 10. The Seventh Circuit already has disposed of Plaintiff's bald, undeveloped claim: "Obviously, having high cholesterol is not in itself disabling; it does not prevent a person from engaging in any of the activities of living and working; it is wholly unlike blindness or paraplegia or the other conventional disabilities that trigger the protection of the ADA." *Christian,* 117 F.3d at 1052. The court added that if a medical condition requires disabling treatment, then that condition could rise to a level warranting ADA protection. *Id.*

In this case, White neither distinguishes himself from the "[t]ens of millions of Americans [that] have high cholesterol," nor argues how his medication would substantially limit his work ability. *Id.* Recognizing White's run-of-the-mill impairment as a disability would convert the ADA into something it is not—a "general protection of medically afflicted persons." *Id.* at 1053.

White cites one incident in 1993 when he experienced dizziness at work due to his high cholesterol. White Depo. at 195. He re-

ceived treatment from his physician and returned to BMC after a brief absence. He has not alleged any other cholesterol-related effects or limitations on his work since that event. *Id.* White agrees that he can "hold down a job successfully" despite his condition. *Id.* at 196; *see also Aucutt v. Six Flags Over Mid–America, Inc.,* 85 F.3d 1311, 1318–19 (8th Cir.1996) (finding that employee under a twenty-pound lifting restriction who also suffered from angina, high blood pressure, and coronary artery disease failed to present evidence that the conditions placed a significant restriction on his ability to perform any major life activity); *Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996) (holding that employee failed to provide evidence that his high blood pressure or side effects from medication substantially limited · his job).

Even when viewing the evidence in a light most favorable to Plaintiff, we must conclude that none of White's conditions substantially limited his major life activity of working.

As a final matter, White does not allege that he has a record of impairment or that BMC regarded him as disabled. First, since we have determined that White has failed to show that he labors under a disability, he cannot establish a record of disability under the ADA. *See Stevo,* 1997 WL 667816, at *6. Second, no evidence suggests that BMC personnel regarded White as substantially limited in his ability to work. *See Davidson,* 133 F.3d at 511 (stating that "to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA. For purposes of § 12102(2)(C), the employer's perception of the plaintiff's inability to work must have a comparable breadth."). White does not cite the record or provide evidence that BMC employees, namely Regnier, regarded White as significantly hindered in any employment capacity. On the contrary, Regnier testifies that he "didn't perceive [that White] had physical problems related to his work." Regnier Dep. at 156. White's performance appraisals and promotion to Senior Safety Specialist also prove that Regnier considered him proficient in performing his job requisites. Plaintiff's Ex. 4(A–I).

Since White is not substantially limited in the major life activity of working, he has no such record and BMC did not so regard him, we must find that no reasonable jury could return a verdict in his favor.

## III. Conclusion

For the reasons discussed, the Court finds that Plaintiff has failed to present evidence that he suffered from a recognized disability under the ADA. Accordingly, Defendant's motion for summary judgment is *GRANTED.*