**James RAGAN, Plaintiff,**

v.

**JEFFBOAT LLC, Defendant.**

**No. NA 00–31–C–B/S.**

United States District Court,
S.D. Indiana,
New Albany Division.

June 18, 2001.

---

1. To date, no transcript of this hearing has been prepared.

Samuel G. Hayward, Nicolas Welsh & Hayward, Louisville, KY, for Plaintiff.

Donna King Perry, Woodward Hobson & Fulton, Louisville, KY, for Defendants.

## ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. *Introduction.*

This is a disability discrimination case brought pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. The plaintiff, James Ragan, alleges that his former employer, Jeffboat, LLC, failed to make reasonable accommodation for him with respect to his disability—a back condition which, he alleges, substantially limits him in the major life activities of walking and working—or, alternatively, that Jeffboat mistakenly regarded him as disabled and disqualified him from work based on its erroneous perception.

The case is before the Court on Jeffboat's motion for summary judgment on both claims. For the following reasons, Jeffboat's motion is GRANTED with respect to Mr. Ragan's "actual" disability claim, but DENIED with respect to Mr. Ragan's "regarded as" disabled claim.

### II. Statement of Facts

The following facts are either undisputed or are stated in a light reasonably most favorable to the plaintiff.

Jeffboat operates an eighty-five acre shipyard on the banks of the Ohio River in Jeffersonville, Indiana. Its primary business is building barges, tugboats, and other marine products for use on inland rivers. It employs about 800 hourly employees, distributed among three work shifts, during five or six day weeks depending upon production demands. The hourly employees are governed by a collective bargaining agreement between the company and General Drivers Warehousemen and Helpers Union, Local 89. De-

fendant's Statement of Material Relevant Facts (Hereafter "Def. Facts") ¶¶ 1, 2. 3.

In 1985, Mr. Ragan sustained a work-related back injury while employed at Whayne Supply, his former employer. Def. Facts ¶ 8; Plaintiff's Supplemental Response to Statement of Facts Set Forth in Defendant's Amended Memorandum in Support of Summary Judgment (hereafter "Pl. Supp. Response"), ¶ 8. In December 1986, Mr. Ragan underwent lumbar fusion surgery at the L5 S1 level. Pl. Supp. Response ¶ 9. As a result of the back injury and the fusion surgery, Mr. Ragan was unable to work for more than two years. Pl. Supp. Response ¶ 10. Whayne terminated Mr. Ragan's employment. Def. Facts ¶ 11; Pl. Supp. Response ¶ 11. The surgery to correct Mr. Ragan's back condition failed. Def. Facts ¶ 12; Pl. Supp. Response ¶ 12. Mr. Ragan's doctor, Richard Holt, recommended that, in view of Mr. Ragan's condition and functional abilities, Mr. Ragan should not undergo another operation. Pl. Supp. Response ¶ 13; Pl. Add. Facts ¶ 4.[1]

Mr. Ragan applied for a job at Jeffboat in April 1990. He disclosed his 1985 back injury on his employment application. Def. Facts ¶¶ 14, 15. The company offered Mr. Ragan a position as an Outside Machinist, on the condition that Mr. Ragan successfully undergo a physical examination. Def. Facts ¶ 16. It appears from Def. Ex. 2 that Mr. Ragan informed Jeffboat that he had been injured, had undergone an operation, and had worn a back brace at work. It also appears from Def. Ex. 2 that he mentioned Dr. Holt's name, which appears on the exhibit in a handwriting apparently other than Mr. Ra-

---

1. Plaintiff filed a Response to Defendant's Amended Motion for Summary Judgment which contains a statement of facts pertinent to its argument. To avoid confusing the "Response" contained in that opposition brief with Mr. Ragan's "Supplemental Response," we continue to use "Pl. Supp. Response" to denote Mr. Ragan's Supplemental Response and refer to facts contained in his opposition brief as "Pl. Add. Facts."

gan's. During the examination, Jeffboat's doctor asked Mr. Ragan about his back condition. Def. Facts ¶ 17. Mr. Ragan testified that the doctor—whom neither party identifies (see Ragan Dep. 117)—told Mr. Ragan that he phoned Mr. Ragan's physician, Dr. Holt, and discussed Mr. Ragan's physical restrictions with Dr. Holt. Pl. Supp. Response ¶¶ 19, 20.

Mr. Ragan passed the physical examination, although the examining doctor noted that Mr. Ragan should "avoid any unusual lifting." Def. Ex. 2. What "unusual lifting" means remains a mystery on the summary judgment record, although Mr. Ragan testified that the examining physician asked him whether he could lift fifty pounds and Mr. Ragan responded that he could by lifting properly. Ragan Dep., 118–119. In May 1990, after he passed the physical examination, Jeffboat hired Mr. Ragan as an Outside Machinist. Def. Facts ¶ 22.

A year later, Mr. Ragan was transferred to the position of First Class Mechanic. Def. Facts ¶ 23; Pl. Supp. Response ¶ 23. Upon his transfer, Mr. Ragan was one of five First Class Maintenance Mechanics on the first shift. Def. Facts ¶ 24. William Hardison was the Maintenance Manager who oversaw the entire Maintenance Department. Def. Facts ¶ 25.

The job duties of a First Class Maintenance Mechanic are outlined in the collective bargaining agreement:

This classification consists of all necessary machine work as indicated on job blueprints or manufacturer specification manuals which the worker must be able to read. (Involves dismantling, repairing and re-assembling of light and heavy facilities machinery.) Must be able to make up bill of material for job to which assigned. May operate the equipment

assigned to repair to check for proper operation and/or adjustment. Should be able to detect mistakes of workers who have preceded and correct same. Must work to very close specifications. Aligns machinery on proper foundations. Sets up and operates boring bar and other equipment necessary to perform maintenance and repair functions.

Def. Facts ¶ 26, Def. Ex. 1; Pl. Add. Facts ¶ 16. Although Mechanics perform regularly-assigned duties, they also may be called away from their regular duties to perform any maintenance job or repairs according to priorities defined by their supervisors. Def. Facts ¶¶ 28, 29. Such duties might include crane repairs, air compressor repairs, jack repairs, field repairs, press and shear repairs, surface prep work, wire installation on cranes, replacing wheels on the gantry[2], vehicle repairs, oiling and paint pump repairs. Def. Facts ¶ 333–34.

Sometime in 1998, Mr. Ragan was assigned the oiling function on a daily basis after another Mechanic left the Company. Def. Facts ¶ 37. The oiling function requires the Mechanic to climb the gantry by elevated walkways and ladders; the oiler lubricates various parts and inspects the crane. Second Class Mechanics ordinarily perform the oiling function, while repairs are performed by First Class Mechanics. Def. Facts ¶ 38; Pl. Supp. Response ¶ 38. Prior to being assigned the daily function of oiling, Mr. Ragan performed that function only when the assigned oiler was on vacation, sick, or out for some other reason. On average he personally performed the function only three days per year. Def. Facts ¶ 39. Marshall Blankenship and Henry Reynolds—two experienced

2. A gantry is a large crane that sits atop a metal structure. The shortest gantry is approximately 50 feet high; the tallest is approximately 85 feet high. Rail cranes are located on the ground and are about three (3) feet high and nine (9) feet wide. Ragan Dep., 147, 276.

Maintenance Mechanics, testified that First Class Mechanics performed the oiling task only when the assigned oiler was out. Blankenship EEOC Aff. (Def.Ex.5); Reynolds EEOC Aff. (Def.Ex.6). *Also see* Def. Facts ¶ 38; Pl. Add. Facts ¶ 22.

Mr. Ragan performed the gantry oiling function for several months without complaint. Although he experienced pain during this period, he first complained after three months to his immediate supervisor, Warren Payne, that performing these tasks was too hard on his back. Def. Facts ¶¶ 41, 42; Pl. Add. Facts ¶¶ 25, 26. Around June 1998, Mr. Ragan slipped on a gantry ladder and sustained an injury requiring him to be off work for four weeks. Def. Facts ¶ 43; Pl. Add. Facts ¶ 28. When Mr. Ragan was injured, a Second Class Mechanic was assigned the oiling function. Pl. Add. Facts ¶ 29. Upon returning to work, Mr. Ragan was reassigned from the task of oiling the gantries and placed in the position of oiling the rail crane. Def. Facts ¶ 44; Pl. Add. Facts ¶ 30. On March 18, 1999, Mr. Ragan complained to Maintenance Manager Hardison that oiling the rail crane was hurting his back. Def. Facts ¶ 45. Mr. Hardison, who stated that oiling the rail crane was the least physically demanding job for a First Class Mechanic, told Mr. Ragan that if he couldn't do that job, he couldn't do any. Def. Facts ¶ 45; Pl. Add. Facts ¶ 32.

Mr. Ragan informed Jeffboat's Safety Director, Steve Morris, that the rail crane oiling job was aggravating his back condition and that it violated the medical restrictions in place at the time of his hire. Upon review of Mr. Ragan's medical file, the only restriction noted was to "avoid unusual lifting." Mr. Ragan told Mr. Morris that there should be more restrictions than lifting. Def. Facts ¶¶ 47, 48; Pl. Add. Facts ¶¶ 33, 34, 35.

In order to clarify Mr. Ragan's condition and restrictions, the Company scheduled an appointment with Mr. Ragan's neurosurgeon, Dr. Richard Holt. Def. Facts ¶ 49; Pl. Add. Facts ¶ 36. On March 26, 1999, Dr. Holt examined Mr. Ragan and placed the following restrictions on him:

The patient's activities are limited to jobs that will not require heavy manual labor. Our suggested restrictions are:

- Avoid vibratory stress such as prolonged driving or heavy equipment operation;
- Avoid prolonged sitting or standing in one position over 45 min at a time;
- Avoid lifting from the floor or working overhead;
- Avoid repetitive bending, stooping or squatting;
- May lift 20 lbs. frequently and 50 lbs. occasionally
- Walking up or down inclined surfaces should be avoided.

The patient would do best at a job that would allow bench top work with light parts.

Def. Facts ¶¶ 49, 50; Def. Ex. 9; Pl. Add. Facts ¶ 37. Dr. Holt later testified that Mr. Ragan was subject to the same restrictions in March 1999 that he had been subject to in 1990. Pl. Add. Facts ¶ 71; Pl. Supp. Resp. ¶ 79; Holt Dep., 8. Dr. Holt testified that, as of April 2000, there was no physical reason Mr. Ragan could not perform the job he had been performing from 1990–1999 and that any deterioration in his ability was owing to normal aging. Holt Dep., 10–11, 19.

The same day as his examination by Dr. Holt, March 26, 1999, Mr. Ragan presented the restrictions specified by Dr. Holt to Shara Haq, Jeffboat's nurse. Pl. Add. Facts ¶ 38; Def. Facts ¶ 51. The following day, after reviewing Mr. Ragan's restrictions, Jeffboat removed Mr. Ragan from his duties. Def. Facts ¶ 52. Mr. Ragan never worked again at Jeffboat, although

for purposes of the collective bargaining agreement he remained on Jeffboat's payroll. Pop Dep., 43–44. Between March 27, 1999 and December 21, 2000, when Jeffboat made Mr. Ragan an offer to return to work, Mr. Ragan was officially employed but assigned no duties. Def. Facts ¶ 54; Def. Reply Brief Ex. A, B; Pl. Add. Facts ¶¶ 40, 42.

Meanwhile, in April 1999, Jeffboat asked occupational physician Dr. Michael Holthouser (who was on retainer to Jeffboat, Pop Dep., p. 25) and Physical Therapist Mark Seigfried, consultants whom Jeffboat often engaged for such purposes, to conduct fitness for duty tests, including a Functional Equivalency Test (FCE), in order to determine how extensive Mr. Ragan's restrictions were and whether there might be other jobs in the plant consistent with his restrictions. Def. Facts ¶¶ 55–58; Pl. Add. Facts ¶ 43. The restrictions advised by Doctors Holthouser and Siegfried included:

• No lifting over 50 lbs.
• No repeated bending/twisting from the waist
• No pushing with more than 25 lbs. of force
• No pulling with more than 80–100 lbs. of force
• No work above shoulder level
• Can walk 15 min. at a time, can sit 60 min. at a time and can stand 10 min. at a time
• Avoid excessive stair or ladder climbing and steep slope descent.

Def. Facts ¶ 59; Def. Reply Brief Ex. 11; Pl. Add. Facts ¶ 46.

After receiving Dr. Holthouser's restrictions, company nurse Shara Haq, Labor Relations Manager Mike Shadoan, Mr. Ragan, and a union steward met on April 21, 1999 to discuss Mr. Ragan's restrictions. Def. Facts ¶ 60; Def. Reply Brief, Ex. 8 (Haq Aff. ¶ 4). Nurse Haq testified that she, Employee Relations Vice President William Pop, and Dr. Holthouser, considered other positions for Mr. Ragan, including: janitor, security guard, welder assignments, steel fitter, tool checker, and material handler. Def. Reply Brief Ex. 8 (Haq Aff. ¶ 6). They concluded that there were no positions available that were consistent with the restrictions imposed by Dr. Holthouser. Def. Facts ¶ 79.

Mr. Ragan insisted that he could perform the "regular" duties of the Maintenance Mechanic; that is, all of the duties required, but not a steady diet of oiling. He continued to tell Mr. Hardison that he had performed the "regular" duties for seven years without difficulty, until assigned to perform the oiling function on a daily basis. Pl. Ex 1. ¶¶ 3–7. Jeffboat contends that Mr. Ragan was offered the options of remaining on sick leave, returning to his regular job with accommodation, or return to a different job. Mr. Ragan vigorously disputes Jeffboat's contention that it offered him the three options (and, therefore, that he refused them). Def. Facts ¶¶ 62, 63; Pl. Supp. Resp. ¶ 62; Pl.Ex. 1, ¶ 6, 7, 8.

Jeffboat instructed Dr. Holthouser to inquire into the physical requirements of performing the oiling function on the supposition that it was the least physically demanding aspect of the Maintenance Mechanic position, so that if Mr. Ragan could not perform those tasks he could not perform any of the other Mechanic tasks. Def. Facts ¶¶ 64, 65; Def. Reply Brief, p. 5 (¶ 44). In addition, Mr. Pop toured the job site and reviewed the duties of a First Class Mechanic. Mr. Pop determined that there were Mechanics' tasks, even apart from the oiling, that were inconsistent with Mr. Ragan's medical restrictions. Def. Facts ¶ 66, 74. Jeffboat concluded that there were no jobs available that Mr. Ragan could perform based on the restrictions set forth by Dr. Holthouser. Def. Facts ¶ 78, 79; Def. reply Brief, p. 6 (¶ 57).

This fact remained true from March 27, 1999 until August, 2000, at which time Mr. Ragan, at Jeffboat's request, submitted to an independent medical examination conducted Dr. Bart Goldman. Physical therapist Seigfried also performed another FCE. Def. Facts ¶¶ 98, 99, 100; Pl. Add. Facts ¶¶ 64, 65.

Based on the reports from Drs. Goldman and Siegfried (neither of which was offered in evidence), Jeffboat determined that Mr. Ragan "no longer had the extensive medical restrictions he had in March, 1999." Accordingly, Jeffboat offered Mr. Ragan the opportunity to return to work in his *prior* position of First Class Mechanic or Outside Machinist. Def. Facts ¶¶ 98–103; Def. Ex. A. When he made the decision to offer Mr. Ragan his old job back, Mr. Pop assumed that Mr. Ragan could return "fully unrestricted." Pop Dep., 48. Mr. Ragan declined the offer to return to work. Def. Facts ¶ 103.

### III. *Analysis.*

#### A. *The Standard on Summary Judgment*

Summary judgment was not designed to be a "paper trial." Instead, on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994); *Winter v. Minnesota Mutual Life Insurance Company*, 199 F.3d 399, 408 (7th Cir.1999). *Also see Harbison v. The Prestige Group*, 2001 WL 395786 (S.D.Ind. 2001) at *1; *Moore v. Hosier*, 43 F.Supp.2d 978, 987–988 (N.D.Ind.1998). It

may also be noted that, while the *grant* of a motion for summary judgment effectively ends a lawsuit on the merits, the *denial* of a summary judgment motion is "strictly a pretrial order that decides only one thing—that the case should go to trial." Denial of the motion "does not settle or even tentatively decide anything about the merits of the claim." *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.*, 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). *See Watson v. Amedco Steel, Inc.*, 29 F.3d 274, 277 (7th Cir.1994).

Thus, "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford–El v. Britton*, 523 U.S. 574, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998); *Higgs v. Carver*, 2000 WL 1902190 at *2 (S.D.Ind.2000). It is not, however, a substitute for a trial, notwithstanding the "drift" in that direction that then-Chief Judge Posner noted five years ago.[3] In considering a motion for summary judgment, the court must draw all inferences in a light reasonably most favorable to the non-movant. It is neither the Court's job nor is it within the Court's competency to resolve swearing contests; nor may the Court choose among disputed issues of fact. *Weeks v. Samsung Heavy Industries Company, Limited*, 126 F.3d 926, 933; *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). In determining a motion for summary judgment, the court bears in mind that a genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106

---

**3.** In *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir.1997), the Seventh Circuit cautioned:

> The expanding federal caseload has contributed to a drift in many areas of federal litigation toward substituting summary judgment for trial. The drift is understandable, given caseload pressures that in combination with the Speedy Trial Act sometimes makes it difficult to find time for civil trials in the busier federal districts. But it must be resisted unless and until Rule 56 is modified. . . .

S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998). "Material facts are those which might affect the outcome of the suit" under the prevailing substantive law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir.2000); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. *See* Local Rule 56.1(h) ("For purposes of summary judgment, a material fact is a potentially outcome determinative fact.") An issue is "genuine" if a reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

On summary judgment, the initial burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party shows the absence of a genuine issue for trial, the burden shifts to the non-movant, which must "go beyond the pleadings," to present evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. If the party opposing summary judgment fails to present evidence that would reasonably permit the finder of fact to find in its favor on a material question, then the court must enter summary judgment against the non-movant. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505.

B. *Defendant's Exhibit 3.*

█ Before turning to an analysis of Mr. Ragan's claims, it is necessary to resolve an evidentiary matter. Pending before the Court is Mr. Ragan's Objection to and Motion to Strike Defendant's Memorandum in Support of its Motion for Summary Judgment on the ground that Jeffboat's motion relies on an unauthenticated document. The document, which Jeffboat identifies as Defendant's Exhibit 3, appears to be a job description for the position of Maintenance Mechanic. Mr. Ragan asserts that the document should be stricken because it is not authenticated and because Jeffboat failed to provide the document during discovery even though one of Mr. Ragan's document requests should have captured it. See Pl. Supp. Response ¶ 26; Pl. Motion to Strike. Without commenting on all of Mr. Ragan's objections to the admissibility of Defendant's Exhibit 3, the Court agrees that Exhibit 3 should be stricken for the following two reasons and the Court will not consider it for purposes of summary judgment.[4]

First, Jeffboat had a duty to produce to Mr. Ragan on discovery all of the documents in its "possession, custody, or control" that Mr. Ragan requested. Fed. R.Civ.P. 34(a). *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, (7th Cir. 1993). What Jeffboat now calls Defendant's Exhibit 3 was in its possession when Mr. Ragan made his request for production, and Mr. Ragan's request for production clearly should have captured that document. Yet Jeffboat did not produce the document during discovery and it now offers no plausible explanation for not having done so. The fact that Mr. Ragan originally produced the document to Jeffboat is irrelevant. *Fort Washington Resources, Inc. v. Tannen*, 153 F.R.D. 78, 79 (E.D.Pa.1994); *Walt Disney Company v. DeFabiis*, 168 F.R.D. 281, 284 (C.D.Cal. 1996). So is the fact that Jeffboat pro-

---

4. The Court will not, however, strike Jeffboat's entire memorandum as Mr. Ragan requests. Jeffboat's Memorandum addresses issues other than the essential features of the Maintenance Mechanic's job, and it supplies evidence other than the offending document of that job's essential functions.

duced the document to the EEOC and that, as a result, Mr. Ragan could have gotten the document through a request to EEOC. Nor is it relevant that Mr. Ragan could have questioned Jeffboat's witnesses about it during their depositions. Unless Mr. Ragan intended to offer the document, he had no independent duty to authenticate it. Since Jeffboat did offer it into evidence, it had such a duty. In short, Jeffboat had a duty to produce the document to Mr. Ragan pursuant to Mr. Ragan's legitimate discovery requests.

■ Second, and decisive by itself, is that Jeffboat has not authenticated the document. The evidence a party cites in support of a motion for summary judgment must be *admissible* evidence. *Corder v. Lucent Technologies Inc.*, 162 F.3d 924, 927–928 (7th Cir.1998). One condition precedent of admissibility is authentication. Fed.R.Evid. 901(a). *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 852–853 (7th Cir.1998). Jeffboat cites Maintenance Manager Hardison's affidavit apparently to establish the authenticity of Exhibit 3 as the Mechanic Job Description. But Mr. Hardison studiously avoids saying that the document is an actual job description that was ever in place at Jeffboat. Indeed, in response to Mr. Ragan's Motion to Strike, Jeffboat admits that it does not "purport that the job description ... is the 'official' job description of a First Class Maintenance Mechanic." Def. Resp. p. 3. Well, then, we ask: what is it? If the document does not even purport to be an actual job description, then it fails the most fundamental test of authentication: some *minimal* showing that the document is what its proponent claims it is. Fed.

R.Evid. 901(a). *See Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir.2001); *Downes v. Volkswagen of America, Inc.*, 41 F.3d 1132, 1143 (7th Cir.1994).

Nor can we say that Mr. Hardison's affidavit testimony effectively incorporates the content of Exhibit 3 because Mr. Hardison nowhere claims first hand knowledge about either the job description or about the specific requirements of the job itself. Although it is logical to assume that, as Maintenance Manager, Mr. Hardison obviously knew the physical requirements of the job, Rule 56(e) requires us not to make assumptions; instead, "[s]upporting and opposing affidavits *shall be made on personal knowledge,* shall set forth such facts as would be admissible in evidence, and *shall show affirmatively that the affiant is competent to testify to the matters stated therein.*" Emphasis added. *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, (7th Cir.2001); *Adusumilli v. City of Chicago*, 164 F.3d 353, 359–360 (7th Cir.1998). In sum, for purposes of summary judgment we cannot consider Defendant's Exhibit 3 as a reliable source of information as to the Maintenance Mechanic's job duties. It is, accordingly, stricken.

### C. *Mr. Ragan's Disability Claims*

#### 1. *Relevant Provisions of the ADA.*

The ADA prohibits an employer from discriminating against a qualified individual with a disability on the basis of the disability. 42 U.S.C. § 12112(a). The statute defines the term "disability" in three different ways, two of which are pertinent here. 42 U.S.C. § 12102(2).[5] One is an "actual" disability—that is, a

---

**5.** (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

 (B) a record of such an impairment; or

 (C) being regarded as having such an impairment.

See *Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 806 (7th Cir.1998); *Baulos v. Roadway Exp., Inc.*, 139 F.3d 1147, 1153–1154 (7th Cir.1998); *Leisen v. City of Shelbyville*, 153 F.3d 805, 807, (7th Cir.1998); *Hoeller v. Eaton Corp.*, 149 F.3d 621, 624–25 (7th Cir. 1998).

physical or mental impairment that substantially limits one or more major life activities. Section 12102(2)(A). The second is often called a "perceived" disability, a circumstance in which the employer erroneously regards the employee as having a disability when the employee has no disability at all, or where the employee does have a disability but the employer erroneously believes that the disability is more severe than it actually is. Section 12102(2)(C); *Sutton v. United Airlines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 2149–2150, 144 L.Ed.2d 450 (1999); *Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 950 (7th Cir.2000).

■ Mr. Ragan has alleged both failure-to-accommodate and disparate treatment claims. The two claims are governed by different legal analyses. "Failure-to-accommodate" cases are subject to a kind of strict liability, whereas "regarded as" cases are governed by the disparate treatment analysis traditional in employment discrimination cases. *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996). *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1032 (7th Cir.1999); *Weigel v. Target Stores,* 122 F.3d 461, 464 (7th Cir.1997). The two are analyzed in greater detail below.

### 2. Mr. Ragan's "Failure to Accommodate" Claim.

■ Under the ADA, an employer has an affirmative obligation to provide a reasonable accommodation for a qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A). Accordingly, a failure-to-accommodate case gives rise to a form of strict liability, a proof scheme in which motive and intent are irrelevant. As the Seventh Circuit observed in *Lenker v. Methodist Hospital,* 210 F.3d 792, 799 (7th

Cir.2000): "if the plaintiff demonstrated that the employer should have reasonably accommodated the plaintiff's disability and did not, the employer has discriminated under the ADA and is liable." *See Weigel,* 122 F.3d at 464; *Bultemeyer,* 100 F.3d at 1283. The plaintiff alleging failure-to-accommodate must show that: (1) he has a disability; (2) the employer knew of the disability; and (3) he is otherwise qualified to perform the job he is doing or seeks to do. *Feldman v. American Memorial Life Insurance Company,* 196 F.3d 783, 789 (7th Cir.1999); *McPhaul v. Board of Commissioners of Madison County,* 226 F.3d 558, 563 (7th Cir.2000).

■ To state a viable claim for relief, a "qualified individual with a disability" must satisfy two sets of criteria: he must present evidence showing that he is an individual with a disability who has the requisite skills, training, experience, and certifications to perform the job he is doing or seeks to do; and he must present evidence showing that he can perform the essential functions of the job either with or without an accommodation. *Bultemeyer,* 100 F.3d at 1284; *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir.1996).

■ Analysis of Mr. Ragan's failure-to-accommodate claim begins and ends with his allegation that he is a qualified individual with a disability. Although no one questions that Mr. Ragan has the necessary skill, training, and experience to perform his job (and numerous others), Mr. Ragan has presented legally insufficient evidence to show that he is "otherwise qualified"—that is, that he has a disability that substantially limits a major life activity.

Mr. Ragan alleges that he was substantially limited in two major life activities: walking and working. Pl. Resp. to S.J., p. 16.[6] Walking and working are major life

---

**6.** Jeffboat erroneously assumes throughout its

brief on summary judgment that Mr. Ragan's

activities. *See* 29 C.F.R. § 1630.2(i); *Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 950 (7th Cir.2000) (walking); *Sinkler v. Midwest Property Management Limited Partnership,* 209 F.3d 678, 684–685, 685, n. 1 (7th Cir.2000) (working). A jury could not, however, reasonably conclude from the evidence that Mr. Ragan is substantially limited in his ability to walk or to work.[7]

First, as to walking, Mr. Ragan acknowledges that Dr. Holt's restrictions—which Mr. Ragan insists are the applicable ones—included a restriction on walking that was quite limited: his walking was restricted only in that "walking up or down inclined surfaces should be avoided." Pl. Resp. to S.J., p. 18. Mr. Ragan was not precluded from walking on flat surfaces. Nor was he restricted in the *amount* of walking he could engage in.

Additionally, Mr. Ragan quarrels with Jeffboat's finding that he was barred altogether from the two related (though admittedly different) activities of "climbing" and "standing." His standing restriction was merely to avoid "prolonged" standing, exemplified by a forty-five minute suggested limitation. Def. Ex. 9. He also argues

that he was restricted only from "excessive" climbing, such as "all day every day." Mr. Ragan argues: "There is nothing in Dr. Holt's medical restrictions that prohibit all, or even any, climbing." Mr. Ragan could even climb up and down ladders. Pl. Add. Facts ¶ 37, 86–88; Pl. Resp. to S.J., p. 19.

As previously noted, the standard against which the ADA measures a "substantial" impairment is the "average person in the general population." 29 C.F.R. § 1630.2(j). Although a Court should be leery of concluding as a matter of law that a particular impairment is not substantially limiting, our common sense understanding of routine physical functions allows us here to conclude that no genuine issue of fact can reasonably be raised. In an analogous case, *McCleary v. National Cold Storage, Inc.,* 67 F.Supp.2d 1288, 1301(D.Kan.1999), Judge Crow conducted an extensive analysis of cases involving walking and concluded that a plaintiff who wore a leg brace and experienced pain with excessive standing and walking presented legally insufficient evidence to raise a reasonable inference that he had an impairment that substantially limited a major life activity.[8] Notably, the EEOC's exam-

---

claimed impairment is that he cannot "lift." It does not address Mr. Ragan's alleged walking disability until its reply brief.

7. One is "substantially limited" in a major life activity if he is:

(i) [u]nable to perform a major life activity that the average person in the general population can perform; or

(ii) [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. 29 CFR § 1630.2(j). See *E.E.O.C. v. Sears, Roebuck & Co.,* 233 F.3d 432, 438 (7th Cir.2000); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 506 (7th Cir.1998).

8. Judge Crow also cited numerous other cases concerning walking and closely related activities such as standing and climbing, and we take grateful advantage of his research: *Taylor v. Pathmark Stores, Inc.,* 177 F.3d at 186 (Plaintiff's "ability to stand or walk is not significantly less than that of an average person" just because he requires ten-minute hourly breaks and walks with a slight limp); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (As a result of one leg being shorter than the other and her foot being permanently flexed, the plaintiff "walk[s] with a limp and move[s] at a significantly slower pace than the average person," but this does not reach "the level of a substantial impairment"); *Penny v. United Parcel Service.,* 128 F.3d 408, 415 (6th Cir.1997) (Walking with "moderate difficulty or pain . . . does not rise to the level of a disability") (collecting cases); *Kelly v. Drexel University.,*

ple of substantially impaired walking involves "an individual who, because of an impairment, can only walk for very brief periods of time." 29 C.F.R. § 1630.2(j). As we noted earlier, the duration of Mr. Ragan's walking was not restricted. Nor was the "manner" in which he was restricted. Evidence that Mr. Ragan should "avoid" walking up or down "inclined surfaces," without the slightest evidence that his job even required such movement, is insufficient to raise a reasonable inference of a substantial limitation. In sum, to permit Mr. Ragan's case to go to a jury strictly on the degree of incline on which he may walk would lead us (more or less literally) down a slippery slope.

 Mr. Ragan's allegation that he was substantially impaired in the major life activity of working is also subject to summary adjudication; indeed, his evidentiary burden is even greater with respect to that allegation. A plaintiff claiming that he is substantially impaired in the major life activity of working—as contrasted with other major life activities—is subject to the requirement enunciated by the Supreme Court in *Sutton:* he must show that he is limited not merely in his ability to perform his own job, but also that he is "significantly restricted in the ability to perform either *a class of jobs* or *a broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities." *Sutton,* 527 U.S. at 473, 119 S.Ct. at 2142 (emphasis added); 29 C.F.R. § 1630.2(j)(3)(i); *See, Mattice v. Memorial Hospital of South Bend,* 249 F.3d 682 (7th Cir.2001), p. 3* (where alleged major life activity is activity other than working, *Sutton* "broad range" requirement does not apply); *EEOC v. Rockwell International Co.,* 243 F.3d 1012, 1017 (7th Cir.2001).

It is clear from Mr. Ragan's own testimony that he was not substantially impaired in the major life activity of working, and his testimony is supported by Dr. Holt's. Both testified that Mr. Ragan could perform all of the essential functions of the job of Maintenance Mechanic even without any accommodation. Mr. Ragan alleges that, at all times during his employment, he could perform all of the Maintenance Mechanic's tasks. After Jeffboat implemented Dr. Holthouser's restric-

---

94 F.3d at 109 (Plaintiff with "visible and apparent" limp who could not walk more than a mile, could not jog and had difficulty climbing stairs was not substantially limited in a major life activity) (collecting cases); *Brower v. Continental Airlines, Inc.,* 62 F.Supp.2d 896, 902–03 (E.D.N.Y.1999) (Expert's report stating that the plaintiff's foot bunions prevented "any extended walking or standing" showed the plaintiff experienced difficulty with walking but did not prove she was "disabled" under the ADA); *Miller v. Airborne Express,* 1999 WL 47242, at *5 (N.D.Tex. Jan. 22, 1999) (Following knee injury and surgery, the plaintiff was not substantially limited in his ability to stand though he preferred to lean on a rail and could stand only thirty minutes without resting); *Bochenek v. Walgreen Co.,* 18 F.Supp.2d 965, 970 (N.D.Ind.1998) (Knee problems after replacement surgery that caused numbness with prolonged sitting, that restricted walking to a few blocks without resting and that resulted in occasional pain did not constitute a substantial limitation on the activity of walking); *Ingles v. Neiman Marcus Group,* 974 F.Supp. at 1002 (Plaintiff was not disabled from walking despite numerous surgeries on both feet, the need to wear special types of footwear, and a restriction against extensive walking on hard surfaces); *Graver v. National Eng'g Co.,* No. 94–C–1228, 1995 WL 443944, at *9–11 (N.D.Ill.1995) (Though he walked with a pronounced limp because of pain and stiffness in his ankles, the plaintiff was not significantly restricted in his ability to walk, care for himself, or work); *Richardson v. William Powell Co.,* 1994 WL 760695, at *3, *7 (S.D.Ohio Nov. 10, 1994) (Degenerative arthritis in hip caused plaintiff to limp and to struggle climbing stairs, but it did not interfere with a major life activity). Also see *Carbaugh v. Pangborn Corp.,* 2001 WL 121769 ,slip op., pp. 3–4 (D.Md.2001).

tions, he told Nurse Haq and a union representative that he could perform all of the "regular duties of the maintenance mechanic." Pl. Add. Facts ¶ 48, 78, 89, 91; Pl. Ex 1. ¶¶ 3–7. By "regular duties" he meant to include the oiling function, but not on a daily basis. Pl. Add. Facts ¶ 94, 95. This contention is supported by Dr. Holt's testimony that Mr. Ragan was as capable of performing all of his tasks in 1999 as he had been in 1990, when he began performing the duties of a Maintenance Mechanic. Pl. Add. Facts ¶ 71; Pl. Supp. Resp. ¶ 79; Holt Dep., 8, 10–11, 19.

But if Mr. Ragan—by his own testimony and supported by Dr. Holt's—had no legally cognizable walking impairment and could perform all of the essential functions of the Mechanic's position even without accommodation (including lifting up to fifty pounds without aid and climbing ladders) then he had no actual disability for purposes of the ADA. Since Mr. Ragan was not substantially impaired in any major life activity, then he was not a "qualified individual" with a disability. And since only a "qualified individual" with a disability is entitled to an accommodation, then he was not entitled to one. Accordingly, we need not determine whether the oiling function was an "essential function" of the Maintenance Mechanic job or whether any of Jeffboat's actions constituted a good faith effort to provide Mr. Ragan with an accommodation. *Basith v. Cook County*, 241 F.3d 919, 932 (7th Cir.2001); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996).

It follows that there is no genuine issue of material fact as to Mr. Ragan's failure to accommodate case and Jeffboat's motion for summary judgment as to that claim is GRANTED.

### 3. *Mr. Ragan's Regarded–As Claim.*

Jeffboat fares less well on Mr. Ragan's disparate treatment claim. In addition to requiring an employer to provide a reasonable accommodation for a qualified individual with a disability, the ADA also protects a qualified individual from discrimination by an employer which regards him as disabled. In *Sutton v. United Airlines*, 527 U.S. 471, 119 S.Ct. 2139, 2149–2150, 144 L.Ed.2d 450 (1999), the Supreme Court noted two ways in which an individual may fall within the "regarded as" category. Both are based on an employer's misperception. One is where the employer mistakenly believes that the employee has a physical impairment that substantially limits a major life activity; the other is where the employer correctly perceives the employee to have an impairment, but erroneously perceives the impairment to be more limiting than it actually is. The Court continued:

> In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability."

*Id.* See *Harrington v. Rice Lake Weighing Systems, Inc.*, 122 F.3d 456, 459 (7th Cir. 1997); EEO Guidance on the ADA, 29 C.F.R. Appendix, § 1630.2(*l* ).

 To establish a *prima facie* case of disparate treatment under the ADA, Mr. Ragan must show that: (1) he is "disabled" as defined by the ADA; (2) his work performance met the defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse action indicate that it is more likely than not that his disability was the reason for the adverse action. *Zakaras v. United Airlines,*

*Inc.*, 121 F.Supp.2d 1196, 1215–1216 (N.D.Ill.2000). *See, Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir.1999). The proper focus of analysis in a "regarded as" case is the employer's perception, which is discernible through its treatment of the employee. 29 C.F.R. § 1630.2(*l*); *Wright v. Illinois Department of Corrections*, 204 F.3d 727, 732 (7th Cir.2000).

■ The evidence presented here precludes this Court from finding as a matter of law that Jeffboat did not discriminate against Mr. Ragan on the basis of a perceived disability. We must first determine that Mr. Ragan was a qualified individual with a disability in the sense that Jeffboat perceived him as disabled and adversely affected his employment opportunities because of its perception. *Wright v. Illinois Department of Corrections*, 204 F.3d 727, 730 (7th Cir.2000). Jeffboat acknowledges that it viewed Mr. Ragan as "impaired" and "restricted" in his work activities, and it has consistently argued that it disqualified Mr. Ragan from jobs based on his extensive medical restrictions of March and April 1999. Def. Reply Brief, p. 6 (¶ 57); Pop Dep., 17–19, 26; Def. Ex. 8. It is true, however, that an employer may regard an employee as "impaired" or "restricted" without necessarily regarding him as "disabled." *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir.2001); *Krocka v. City of Chicago*, 203 F.3d 507, 512–513 (7th Cir.2000); *Harrington v. Rice Lake Weighing Systems, Inc.*, 122 F.3d 456, 460–61 (7th Cir.1997).

■ This case tests the line between an employer's honest belief that the employee is "impaired" or "restricted" on one side, as contrasted with "disabled" on the other. Here, a jury could reasonably conclude from the evidence presented on summary judgment that Jeffboat erroneously regarded Mr. Ragan not merely as "restricted" or "impaired" but as "disabled." We turn now to the specific facts that could give rise to these inferences and conclude that they constitute the kind of "convincing mosaic" that the Seventh Circuit has endorsed as a method of raising a reasonable inference of discrimination on summary judgment. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168–1169 (7th Cir. 1998); *Troupe v. May Department Stores*, 20 F.3d 734, 736 (7th Cir.1994).

First, assuming that "working" is the major life activity at issue here, Jeffboat disqualified Mr. Ragan from a wide range of jobs for a lengthy period of time. Jeffboat's testimony that Mr. Ragan could not perform his own job and also could not perform the functions of janitor, security guard, welder, steel fitter, tool checker, and material handler, strongly suggests that it perceived him as "significantly restricted" in his ability to perform "a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."[9] Def. Reply Brief Ex. 8 (Haq Aff. ¶ 6).

In *EEOC v. Rockwell International Co.*, 243 F.3d 1012 (7th Cir.2001), the Seventh Circuit discussed the quality and quantity of evidence required to raise an inference that the employer regarded the plaintiff as disqualified from a broad range of jobs in a class or a variety of jobs across several job

---

**9.** As the Seventh Circuit noted in *EEOC v. Rockwell International Co.*, 243 F.3d 1012, 1017 (7th Cir.2001): "A 'class of jobs' is the job from which a claimant was disqualified, as well as all other jobs utilizing similar training, knowledge, and skills within the geographical area to which the [claimant] has reasonable access." 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B). A broad range of jobs in various classes, in contrast, is the job from which a claimant was disqualified, as well as all other jobs not utilizing similar training, knowledge, and skills within "the geographical area to which the [claimant] has reasonable access." 29 C.F.R. § 1630.2(j)(3)(ii)(A), (C).

classes. The Court affirmed summary judgment in favor of Rockwell because the only evidence EEOC presented in support of its argument that Rockwell regarded the applicants as disabled was that "Rockwell perceived them as unable to perform four specific jobs at Rockwell." *Id.* at 1018. Absent other probative evidence that Rockwell regarded the applicants as significantly restricted, the Court required EEOC to present data concerning jobs in the relevant geographical area from which the applicants were excluded because of their perceived disability. At the same time, however, the Court expressly rejected a *per se* rule that a plaintiff is required to present such statistical job data in order to survive summary judgment. *Id.* at 1017.

We believe the facts here are sufficiently different from those in *Rockwell* to produce a different result. In Rockwell, applicants were refused employment for four unskilled, entry-level positions "requiring frequent repetition or the use of vibratory power tools." *Id.* at 1016, 1018. The evidence here shows that Jeffboat disqualified Mr. Ragan from seven jobs: his own skilled position as a Maintenance Mechanic plus the jobs of janitor, security guard, welder, steel fitter, tool checker, and material handler. It does not require a degree in kinesiology, vocational rehabilitation, ergonomics, or other similar sciences to conclude that the physical requirements of these positions vary significantly. And so do the levels of required skill. Additionally, Jeffboat claims that it continued to search, in vain, for *any* job he might be able to perform for a period of some sixteen months. Evidence showing that Jeffboat removed Mr. Ragan from his own job,

disqualified him from six other positions requiring various skills and physical functions, and was unable to find any position that he could perform because of his physical limitations, in a facility employing 800 workers, for a period of sixteen months, raises a reasonable inference that Jeffboat regarded Mr. Ragan as unable to perform a wide range of jobs across several job classifications and thus to be substantially impaired in the major life activity of working. In several cases, district courts have found that the employer's disqualification of an employee from all jobs in the work place because he or she could not perform any currently available job was sufficient to raise an inference of discrimination. *Dipol v. New York City Transit Authority,* 999 F.Supp. 309, 314 (E.D.N.Y.1998); *Coleman v. Keebler Co.,* 997 F.Supp. 1102, 1112–1113 (N.D.Ind.1998) (disqualified from twelve specific jobs and found that no currently available job would accommodate plaintiff's restrictions).[10] *Also see, Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 188 (3d Cir.1999); *Webner v. Titan Distribution, Inc.,* 101 F.Supp.2d 1215, 1222–1223 (N.D.Iowa 2000).

Second, the stubborn fact persists throughout this case that Mr. Ragan had successfully performed the Maintenance Mechanic job for seven years without accommodation and without complaint; he did so until he was assigned the oiling function on a daily basis and there is no evidence that he could not have continued to perform his original job. His only complaint to Mr. Hardison in March 1999 was that he was experiencing some back pain. As we saw earlier, this constellation of facts militates *against* Mr. Ragan's claim

---

**10.** Although both *Dipol* and *Coleman* were decided before *Sutton,* both district courts, following the law of their respective circuits, required a showing that the employee was regarded as being unable to perform not merely her own job but a broad range of jobs.

See *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 721–22 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908, 911 (7th Cir.1996).

that he had an actual disability and that Jeffboat unlawfully failed to provide an accommodation. But it tends to support Mr. Ragan's "regarded as" claim because it supports the proposition that Jeffboat erroneously perceived Mr. Ragan as so impaired that he could perform neither his own job nor a range of other jobs in the workplace. It also supports an inference that Jeffboat exaggerated Mr. Ragan's impairments. See *Deane v. Pocono Medical Center,* 142 F.3d 138, 145 (3d Cir.1998). Similarly, Mr. Ragan vocally insisted to Jeffboat's nursing and management personnel that he could perform the "regular" functions of his job and Dr. Holt's testimony supports this claim. Once again, while this fact tended to undermine Mr. Ragan's failure to accommodate claim, it tends to support his regarded as claim, because it casts doubt on Jeffboat's conclusion that Mr. Ragan could not perform his job or a wide range of other jobs.

Third, while Jeffboat asserts that, after Dr. Holt's examination of Mr. Ragan in March 1999, it sought to provide Mr. Ragan with an accommodation by looking for other jobs in the facility that Mr. Ragan might be able to perform, it did not consult with Mr. Ragan or with Dr. Holt when it undertook that search. Indeed, it never consulted with Dr. Holt after Dr. Holt performed his examination in April 1999. Pl. Add. Facts ¶ 75. Instead, a month

later it sought another medical opinion, that of Dr. Holthouser, whose services it retains for such purposes. This is not to hold that Jeffboat had a legal duty to accommodate Mr. Ragan and thus to engage in the "interactive process." [11] But Jeffboat says that it took affirmative steps to accommodate Mr. Ragan's impairments by ordering Dr. Holthouser's examination and by inquiring into the requirements of other jobs. Based on the following facts, which we construe in favor of Mr. Ragan, a jury might reasonably question whether Jeffboat's claim that it sought to accommodate Mr. Ragan is an honest one:

● Jeffboat did not ask Mr. Ragan which tasks he thought he could and couldn't perform; it made no such inquiry as to his job nor as to any other in the plant. Pl. Add. Facts ¶¶ 79. The Third Circuit has held that engaging in the interactive process is appropriate even in the context of a perceived disability. *Deane v. Pocono Medical Center,* 142 F.3d 138, 149 (3d Cir.1998). But even if we don't *require* an employer to consult with an employee whom it believes to be impaired, the employer's failure to do so is probative as to whether it acted in good faith in disqualifying him from various jobs, particularly when it says that it made an honest and widespread effort to find him one.

● Before seeking another medical opinion, Jeffboat did not inquire of Dr. Holt

---

11. As to the "interactive process" and its relationship to the employer's duty to provide a reasonable accommodation, see *Ross v. Indiana State Teacher's Association Insurance Trust,* 159 F.3d 1001, 1013–14 (7th Cir.1998), *cert. denied,* 525 U.S. 1177, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999). Since the issue has not been raised here we do not decide the difficult and controversial question of whether an employer owes an accommodation to an employee whom it *perceives* to be disabled, as contrasted to an employee with an *actual* disability. One circuit court has held that there is no such duty. *Webber v. Strippit, Inc.,* 186 F.3d 907, 917 (8th Cir.1999), *cert. denied,*

528 U.S. 1078, 120 S.Ct. 794, 145 L.Ed.2d 670 (2000) ("[W]e hold that 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations"). Several other courts have discussed the issue. *Deane v. Pocono Medical Center,* 142 F.3d 138, 148, n. 12 (3d Cir.1998), *en banc; Coleman v. Keebler Co.,* 997 F.Supp. 1102, 1111, 1119 (N.D.Ind. 1998). The Seventh Circuit has strongly suggested that an employer owes a reasonable accommodation not only to a qualified individual with an actual disability, but also to a qualified individual with *a record of disability. Davidson,* 133 F.3d at 509.

about Dr. Holt's recommended restrictions and what they entailed. Furthermore, although Jeffboat denies that it knew of Dr. Holt's restrictions before April 1999, a jury could reasonably believe Mr. Ragan's testimony, supported by one of Jeffboat's exhibits, that it knew of Mr. Ragan's restrictions as early as May 1990 when it hired him.[12] Had Jeffboat consulted with Mr. Ragan and/or Dr. Holt at the time it was disqualifying Mr. Ragan from at least seven jobs in the work place instead of years later in the course of litigation, it might have learned (as Dr. Holt later testified) that Dr. Holt believed Mr. Ragan was as capable of performing all of his tasks in 1999 as he had been in 1990, just as Mr. Ragan was saying. That Jeffboat knew of Dr. Holt's restrictions and failed to discuss them either with him or with Mr. Ragan

and, instead, sought another medical opinion, may raise an inference that Jeffboat's explanation of its conclusion that Mr. Ragan could not perform a wide range of jobs is less than sincere.

● Jeffboat asked Dr. Holthouser to inquire into the essential functions only of the oiling task.[13] It did not ask him to inquire into any other function associated with the Maintenance Mechanic job and it did not ask him to inquire into the functions of any other job which, it asserts, it sought for Mr. Ragan. Jeffboat argues that it assigned Dr. Holthouser to inquire only into the oiling tasks because it supposed that the physical requirements associated with the oiling tasks were "less strenuous" than the others. But, as Mr. Ragan points out, "less strenuous" is a comparative determination. What is "less strenuous" to Mr. Hardison or Mr. Pop

---

**12.** Defendant's Exhibit 2, which Jeffboat dates from Mr. Ragan's hire, reveals that Mr. Ragan informed Jeffboat that he had been seriously injured, had been operated on, and had worn a back brace. We may also infer from Exhibit 2 that Mr. Ragan mentioned Dr. Holt's name, because Dr. Holt's name appears on the exhibit in a handwriting apparently other than Mr. Ragan's. According to Mr. Ragan's unrebutted testimony, during the examination, Jeffboat's doctor asked Mr. Ragan about his back condition. Def. Facts ¶ 17. Mr. Ragan testified that the unidentified doctor told Mr. Ragan that he phoned Dr. Holt and discussed Mr. Ragan's physical restrictions with Dr. Holt. Pl. Supp. Response ¶¶ 19, 20. Def. Ex. 2. If, as we must conclude, the unidentified physician knew of Dr. Holt's restrictions, his or her knowledge is almost certainly to be imputed to Jeffboat because a physician who examines an employee at the employer's behest is almost certainly the employer's agent concerning information that is integral to the examination. *See,* under analogous circumstances, *Fulk v. Illinois Central RR Co.,* 22 F.3d 120, 125, n. 3 (7th Cir.1994); *Fletcher v. Union Pacific RR Co.,* 621 F.2d 902, 909–910 (8th Cir.1980).

**13.** Earlier in this entry we left open the question of whether the oiling task was an essen-

tial function of the Maintenance Mechanic's job because that question goes to the issue of whether Jeffboat had a duty to accommodate Mr. Ragan's disability. Since we determined that he did not have an actual disability that entitled him to an accommodation, the issue did not need to be resolved. We note here that, based on the evidence of record, that issue would be resolved in favor of Mr. Ragan for purposes of summary judgment. First, the collective bargaining agreement specifies that oiling is the function of a second class mechanic; oiling is not mentioned in the section of the cba that outlines the duties of a first class mechanic. Def. Ex. 1; Def. Facts ¶ 25. Second, Marshall Blankenship, a thirty-one year Maintenance Mechanic, testified that: "The maintenance mechanics are responsible for the oiling jobs only if the person assigned is out or for some reason can't do it that day. *It is not a daily job duty of the maintenance mechanic."* Def. Ex. 5 (Blankenship EEOC Affidavit) (emphasis added); Def. Ex. 6 (Reynolds EEOC Affidavit). Finally, after Mr. Ragan was injured in 1998, a second class mechanic was reassigned to perform the oiling that Mr. Ragan had been performing. Pl. Add. Facts ¶ 29. For these reasons, there is a genuine issue of material fact as to whether oiling is an essential function of a maintenance mechanic's job.

may not be to Mr. Ragan. That is why the ADA requires an "individualized inquiry" into alleged disabilities, an inquiry which Jeffboat did not perform. *Sutton,* 527 U.S. at 483, 119 S.Ct. at 2147.

Fourth, after concluding that Mr. Ragan was so substantially impaired that, for sixteen months, he could not perform any available job in the factory, in August 2000 Jeffboat consulted yet another physician, Dr. Bart Goldman, and also asked Dr. Siegfried to conduct another FCE. Once again, it requested these analyses without consulting Mr. Ragan or Dr. Holt. Jeffboat concluded on the basis of these new reports that Mr. Ragan no longer had any impairment at all and could return to his own position without restriction.[14] While we do not conclude that this turnaround in Mr. Ragan's functional abilities was miraculous, the "unconditional" job offer and the remarkable recovery it is premised on were events that might reasonably prompt a jury to question whether Jeffboat honestly believed that Mr. Ragan had been unable to perform his job, and at least six others, for the sixteen months prior to August 2000.

But, Jeffboat says, it based its employment decisions on its doctors' medical opinions and the ADA should not be used as an instrument for undermining an employer's good faith reliance on its physicians' advice. Jeffboat is correct in arguing that an employer may ordinarily rely on its doctors' examinations and advice in making employment decisions. But the general rule is not without exception and, in the context of the ADA, the employer bears the risk of mistakenly treating an employee as disabled if it turns out that the employee isn't. *Bay v. Cassens Trans-*

*port Company,* 212 F.3d 969, 975 (7th Cir. 2000); *Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 192 (3d Cir.1999). As the Seventh Circuit has observed, "a company may not be able to escape liability in situations where a plaintiff can demonstrate that the company's reliance on its doctor's medical determination was unreasonable or in bad faith." *Bay,* 212 F.3d at 975. *Also see Holiday v. City of Chattanooga,* 206 F.3d 637, 645 (6th Cir.2000) ("Employers do not escape their legal obligations under the ADA by contracting out certain hiring and personnel functions to third parties.").

Here, Jeffboat had inconsistent (and possibly conflicting) medical opinions and chose to rely on some advice while it ignored other advice. For instance, Jeffboat says that it relied on Dr. Holthouser's opinion and advice to conclude for sixteen months that Mr. Ragan was so substantially impaired that there were no jobs in the plant he could perform, and then, in August 2000, it relied on Dr. Golden's opinion and advice to conclude precisely the opposite: that Mr. Ragan no longer suffered from any impairment at all and could return to his job as a Maintenance Mechanic. Meanwhile, Dr. Holt's testimony—available but not consulted—indicated that nothing much in Mr. Ragan's physical status had changed during the decade between 1990 and 2000.

In sum, we do not say on summary judgment that Jeffboat *did not* rely in good faith on its doctors' opinions. We merely note that we cannot conclude as a matter of law that it *did.* Mr. Ragan has adduced enough legally probative evidence to show that there is a genuine issue of material fact as to that issue.

---

**14.** Although Jeffboat says that it relied on the two doctors' reports in offering Mr. Ragan a job, Jeffboat did not offer either report into evidence. And while Mr. Ragan did not point this out in his opposition to summary judg-

ment, the Court has a duty under Rule 56(e) to determine whether, based on the evidence, it is "appropriate" to grant summary judgment.

Finally, we cannot simply ignore the fact that Jeffboat erroneously perceived "lifting" as the major life activity at issue and disqualified Mr. Ragan from his own job at least in part on the basis that he was substantially impaired in his ability to lift. As previously noted, lifting is one of those tasks that yields more readily than most physical functions to common sense determination. Dr. Holt said that Mr. Ragan could lift twenty pounds frequently and fifty pounds occasionally. Def. Facts ¶ 49, 50; Def. Ex. 9; Pl. Add. Facts ¶ 37. Even Dr. Holthouser implied that Mr. Ragan could do so by noting he could not lift more than fifty pounds. Def. Facts ¶ 59; Def. Reply Brief Ex. 11; Pl. Add. Facts ¶ 46. Nothing in the record suggests that Mr. Ragan had to lift more than twenty pounds frequently or more than fifty pounds occasionally in order to perform his job as a Maintenance Mechanic. In other words, Jeffboat's own medical evidence indicates that it erroneously perceived Mr. Ragan as substantially impaired in the major life activity of lifting. *See, e.g., White v. Boehringer Mannheim Corp.*, 28 F.Supp.2d 527, 536 (S.D.Ind. 1998); *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1240–1241 (10th Cir.2001). *Also see Marinelli v. City of Erie*, 216 F.3d 354 (3d Cir.2000) (holding that ten pound restriction not substantially impairing); *Thompson v. Holy Family Hospital*, 121 F.3d 537, 541 (9th Cir.1997); *Aucutt v. Six Flags Over Mid–America*, 85 F.3d 1311, 1319 (8th Cir.1996).

We do not conclude that a jury will, somehow, be compelled to find in favor of Mr. Ragan. It is ·entirely possible that Jeffboat properly concluded that Mr. Ragan was "impaired" and medically "restricted," but not "disabled." It is also possible that Jeffboat honestly sought to accommodate Mr. Ragan. It is equally possible that Jeffboat sought medical opinions in order to advance Mr. Ragan's best interests as well as to satisfy itself as to Mr. Ragan's physical status and to limit its own potential liability. It is also possible that Jeffboat properly concluded that Mr. Ragan's condition was only temporary and that, during the sixteen months he was not actually employed, he made sufficient improvement to return to work. But we cannot say on summary judgment that these things are conclusively true, so a jury will have to make those factual determinations. Mr. Ragan's evidence is strong enough to raise genuine issues of material fact that this Court cannot resolve in Jeffboat's favor on summary judgment.

### D. *Mr. Ragan's Other Claims.*

#### 1. *Record of Disability.*

Mr. Ragan argues that he had "a record of disability," thus invoking the ADA's second protection. Section 12102(2)(B). His entire claim, and the evidence (or lack thereof) on which it is founded, is contained in the following statement:

> Following his failed lumbar fusion in 1987, Ragan was disabled and completely unable to work for two years. He therefore has a record of being disabled prior to the adverse employment actions by Jeffboat. Ragan's proof on this issue was not rebutted. In fact, the Defendant did not even address this prong of the disabled definition in its Memorandum. Defendant's failure to argue an element that would show that Ragan meets the definition of an individual with a disability should, as a matter of law, preclude the Defendant from obtaining summary judgment on this issue. At a minimum, Ragan's unrebutted evidence on this definition presents a genuine issue of material fact so that summary judgment is not available.

Pl. Response, p. 17. Mr. Ragan repeats this essential argument in his Surreply, p. 3.

The ADA's protection against discrimination based on a record of impairment is, like the "regarded as" provision, governed by traditional disparate treatment analysis. *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 509 (7th Cir.1998). *See Hilburn v. Murata Elec. N. Am. Inc.,* 181 F.3d 1220, 1229 (11th Cir.1999). But all Mr. Ragan presents on this claim is that he had had back surgery in 1987 and Jeffboat knew it. He does not provide any evidence of a causal connection between his record of impairment and any adverse employment action.[15] We are left to infer causation from the mere existence of the record and a later adverse employment action. It is well settled in "regarded as" cases that an employer's mere knowledge of an impairment is insufficient to establish even a prima facie case of discrimination. *Amadio,* 238 F.3d at 927; *Zakaras,* 121 F.Supp.2d at 1211. The same reasoning applies here. Accordingly, Jeffboat's motion for summary judgment as to Mr. Ragan's record of impairment claim is GRANTED.

### 2. *ERISA and Pay Increases.*

Mr. Ragan acknowledges in his opposition to summary judgment that he is not alleging an independent claim for benefits under ERISA. He also acknowledges that he is not alleging an independent claim that Jeffboat failed to promote him or pay wage increases to him. Instead, he notes that, in the event he should prevail, benefits and pay increases denied to him

as a result of discrimination would be recoverable as damages under the ADA. Pl. Response, p. 33. Accordingly, Jeffboat's motion for summary judgment as to Mr. Ragan's ERISA claim and as to his Failure to Promote and Pay Increases are GRANTED.

### IV. *Conclusion.*

Jeffboat's motion for summary judgment is GRANTED with respect to Mr. Ragan's "failure to accommodate" claim and, to the extent they are actually claims at all, with respect to Mr. Ragan's "record of impairment," ERISA, and failure to promote and pay increased wages claims. Jeffboat's motion for summary judgment is DENIED as to Mr. Ragan's "regarded as" claim.

---

15. Mr. Ragan alleges that his record of impairment is that he had a failed surgery in 1987 prior to being hired at Jeffboat. Aside from the apparent statute of limitations problems associated with a ten year old claim (which Jeffboat does not mention in its reply brief), according to Mr. Ragan's own evidence and argument Jeffboat hired him notwithstanding this "record of impairment." Indeed, Jeffboat conducted a pre-employment physical knowing that he had undergone back surgery and wore a brace. By hiring him, Jeffboat took a *favorable* employment action toward him, and not an adverse one. Had Jeffboat *refused* to hire Mr. Ragan because of his disclosure of the failed back surgery and its ensuing problems, Mr. Ragan might have had a failure-to-hire claim based on a record of impairment. 42 U.S.C. § 12112(a) (protects against discrimination of qualified individual who makes "job application"); *Szymanski v. Rite–Way Lawn Maintenance Co., Inc.,* 231 F.3d 360, 363 (7th Cir.2000). But that issue need not detain us.